Appellant was indicted for the February 2, 1980, arson of the Mayer Electric building located on Adams Avenue in downtown Montgomery, in violation of Alabama Code § 13A-7-42 (Amended 1977.) A lengthy trial followed with the jury, after several days of deliberation, finding her guilty of arson in the second degree as charged in the indictment. Subsequent thereto, the trial court held a sentencing hearing where it fixed appellant's punishment at three years' imprisonment. From that conviction she now appeals in forma pauperis.
Larry Miles, president of APCOA, Incorporated, which installs burglar and fire alarm systems, testified that, on February 2, 1980, Mayer Electric was a client of his, having a 24-hour alarm system covering its building on Adams Avenue. The system could be turned off at two places, one being a door facing Hilliard Street, which was the primary entrance and exist used by Mayer employees, and the other at the main control panel inside an office in the building. The door control was key operated and suppressed only that portion of the alarm protecting the door. If the integrity of the system was challenged, an alarm was sounded at APCOA headquarters, which in turn immediately called the police and a representative of Mayer Electric.
Around 1:20 a.m., February 2, such a situation occurred. Miles called the Montgomery Police Department and Chuck Peppers of Mayer Electric. Later that morning Miles viewed the scene of the fire and found the main control panel in an "on" position and the Hilliard Street door control in an "off" position.
Montgomery Police Officer M.E. Wright testified that, around 1:20 a.m. or 1:30 a.m., February 2, he drove past the Mayer Electric building and saw smoke billowing *Page 1105 
from the roof. He called the police station and requested that the fire department be notified. Officer Wright checked the building and found no broken windows, no unlocked doors or fences, and no signs of forced entry. He stated that it appeared that the fire had been burning for some time.
Mayer Electric purchasing agent Charles Peppers testified that he and warehouse manager Alvin Thomas were the last people to leave the building on February 1, that being around 5:30 p.m. He left via the Hilliard Street exit. Peppers stated that he locked the door and activated the alarm system. He did not know whether appellant had keys to the door and alarm system. Around 1:30 a.m. on February 2 he received a telephone call from APCOA informing him that the alarm system had been triggered. He drove to the Mayer Electric building arriving around 1:45 a.m., and saw the fire department officials attempting to force their way through the Hilliard Street door. He offered a key to them which they used to gain entrance. They had already entered the building from Adams Avenue through a window. Peppers testified that the main control panel was located in his office but he did not activate it prior to his leaving. Rather, Alvin Thomas informed him that he had turned it on.
Peppers testified that appellant's desk was located in the computer room which experienced an overloaded electrical circuit the afternoon of February 1, causing a fuse to blow. He stated that blown electrical fuses were not uncommon occurrences at Mayer Electric and had happened several times in the past. In addition, he stated that in 1977 there had been a fire in the building which had extensively damaged the inventory. Appellant was employed with Mayer at the time. Peppers stated that it was each department's responsibility to turn the lights and equipment off and secure its work area before leaving each evening.
Montgomery Fire Department District Chief Wayne Grier testified that, around 1:30 a.m. on February 2, his company received a call concerning the fire at the Mayer Electric building. The company responded within three to four minutes. Upon arriving at the scene, the firemen found no unlocked entrance and forced their way into the building by breaking windows and glass doors. Chief Grier stated that later a Mayer employee unlocked the Hilliard Street door. No attempt was made to disengage the alarm protecting the door. Chief Grier testified that it took about ten to fifteen minutes to gain control over the fire which he estimated had been burning for approximately forty-five minutes to one hour. The fire was subsequently extinguished. He called Chief Arson Investigator Charles Kelly.
Montgomery Fire Department Arson Investigator Charles Kelly testified that, between 2:15 a.m. and 2:30 a.m. on February 2, he arrived on the scene of the Mayer Electric building fire. After being qualified as an expert without objection, Investigator Kelly testified that his investigation revealed that the fire had started in the computer room and had been concentrated therein. He found two areas of intense heat and burning in the room, termed "hot spots," which he concluded were the points of origin of the fire. The "hot spots" were not near the baseboard heaters in the room. In addition, a portable heater in the room, while completely destroyed, was unplugged. The two areas had burned through the carpet and tile floor beneath it to the concrete foundation. He stated that the two "hot spots" had burned nearly simultaneously. Investigator Kelly stated that the fire produced intense heat which completely destroyed two oak desks. He eliminated any heating or lighting fixture as the cause of the fire, as well as any malfunction to the electrical circuitry of the building. In addition, he stated that the fire was not caused by spontaneous combustion or an unextinguished cigarette.
Investigator Kelly found in the computer room a cleaning fluid containing alcohol. He stated that alcohol had good penetrative qualities and settles at the lowest point of *Page 1106 
an area. He took samples from the debris remaining in the computer room to determine whether an accelerant such as alcohol had been used. Although Investigator Kelly expressed an opinion that the cleaning fluid could have been used in setting the fire, the tests results proved to be negative.
Prior to entering the building, Investigator Kelly had viewed the Hilliard Street door and found the alarm system at that entrance disengaged. He found no signs of forced entry into the building. Investigator Kelly testified that interviews with the firemen who had fought the blaze revealed that the office area had been ransacked prior to their entering the building.
Investigator Kelly concluded that the fire was set intentionally by an arsonist.
The state's next witness was Donald Zwick, a fire investigator for System Engineering Associates of Atlanta, Georgia. After being duly qualified as an expert in arson investigations, Zwick testified that, on February 6, 1980, he, accompanied by Investigator Kelly, investigated the fire at the Mayer Electric building. Zwick's conclusions, based upon his independent observations, were identical to that of Investigator Kelly. Zwick determined the origin of the fire to have been located in the computer room and the fire to have been deliberately caused. He stated that a flammable accelerant of some type was used to set the fire. Zwick eliminated all possible accidental causes of the fire, including any electrical sources.
Mr. Robert Kelly testified that, on February 1 and 2, 1980, he was employed by Mayer Electric Company and was appellant's supervisor. Kelly described an illicit relationship he had had with appellant. Appellant possibly became pregnant from such relationship and Kelly described appellant's emotional condition. Kelly stated that appellant discussed the possibility of her pregnancy with him on February 1. He stated that, after initially being upset, appellant seemed calm by that afternoon and told him that she was going to visit her sister in Pensacola, Florida, over the weekend and discuss the situation with her. Kelly later heard that appellant had had an abortion.
Kelly testified that, on the Friday one week prior to the fire, he had given his keys to the Hilliard Street door and alarm system to appellant so that she and another employee, Brenda Conway, could enter the building the next day to work. He stated that appellant and Conway worked that weekend. On Thursday, January 31, Kelly asked appellant for the keys but did not receive them. Appellant began to remove them from her key ring but Kelly was called away and she never gave them to him. Kelly testified that appellant was a trusted employee and could have procured keys to the building whenever she wanted them.
On Friday, February 1, office manager Jim Summerlin discussed with Kelly and appellant the recent inventory shortage the company had experienced. Kelly stated that appellant and he had found a large portion of the shortage. However, he stated that Summerlin told them that he would come to work on Saturday, February 2, and review the records before calling the auditors.
Kelly discussed the 1977 fire at Mayer's as well as a fire that occurred at the Birmingham office. He stated that his office had received threatening calls before and after the 1977 fire. Kelly indicated that cleaning fluid and alcohol were stored in a desk in the computer room not used by the appellant.
Mr. Alvin Conway testified that he operated a service station on the South Boulevard near Interstate 65 and that appellant was a regular customer. He knew appellant well as she lived with his daughter, Brenda Conway. Around 6:30 p.m. or 7:00 p.m., on February 1, Conway filled appellant's car with gasoline. At that time appellant told him that she was going to Pensacola but did not say when she would be leaving.
Brenda Conway testified that she was an employee of Mayer Electric and had known appellant personally for some time. In *Page 1107 
fact, appellant and Miss Conway had been roommates prior to and after Miss Conway's marriage. She stated that they discussed their personal problems together and she knew about appellant's relationship with Robert Kelly and the possibility that she could have been pregnant with his child.
On February 1, Miss Conway did not work but called appellant before lunch to discuss her payroll check. Miss Conway stated that appellant sounded upset and mentioned terminating her employment with Mayer because of her relationship with Kelly. Later that afternoon, Miss Conway picked up her check and saw appellant, who did not appear to be upset. Around 6:00 p.m., appellant returned to their residence and told Miss Conway she was going to Pensacola to visit her sister. Miss Conway testified that she understood appellant to mean that she was leaving for Pensacola as soon as she finished packing. Miss Conway stated that she was questioned concerning the fire at Mayer Electric and that two investigators, Burroughs and Kelly, told her that they did not think appellant started the fire, but that she might be covering up for someone.
The state recalled Investigator Kelly who testified to his interviewing appellant on February 14. He stated that he advised her of her Miranda rights. He stated that appellant acknowledged that she understood her rights and signed a waiver of rights form. A proper voluntariness predicate was then laid. The statement was admitted into evidence without objection.
In her statement appellant, after initially stating that after work she went directly to Pensacola, changed her statement and admitted being at Mayer Electric the evening of February 1. She stated she left the building around 12:30 a.m. on February 2. She made two telephone calls to Pensacola while at Mayer, one at 7:06 p.m. and the other at 9:50 p.m. Appellant stated that she failed to reactivate the alarm system when she left but said that she locked the Hilliard Street door.
Investigator Kelly testified that appellant did not change her story concerning her whereabouts on February 1, until he informed her that a police officer had seen her car at the Mayer Electric building. He denied discussing with Miss Conway appellant's possible involvement in the fire.
Montgomery Police Corporal M.S. Ward testified that, between 12:00 a.m. and 1:00 a.m. on February 2, he saw a late model Ford with a white top and dark body parked at the Mayer Electric building. He did not investigate because he had seen the car parked there before on numerous occasions.
Jim Summerlin, manager of Mayer Electric of Montgomery, testified that, around 12:00 noon on February 1, he discussed with appellant and Robert Kelly the recent inventory shortage and his coming to work on Saturday to attempt to find it. He stated that because of the fire, the reasons for the shortage (which totalled about $170,000) could never be determined. Summerlin was aware of fuses failing in the building but did not think that the computer room had overloaded circuits. He also knew of the threats made before and after the 1977 fire, but stated that they were found to have been made by a "con artist." He stated that three or four months prior to the fire, appellant had mentioned her leaving the employ of Mayer. He thought appellant was a responsible employee but found it out of character for her not to have reactivated the alarm after she left the building on February 2. Summerlin stated that appellant was not normally entrusted with keys to the building but he or Robert Kelly could authorize her having them.
Mr. Summerlin's testimony concluded presentation of the state's case in chief. Appellant moved for a directed verdict which the trial court denied.
Appellant called several character witnesses as well as her mother and sister, who testified about their conversations with appellant on February 1 and 2.
Robert Kelly was called as a defense witness and testified that the records destroyed by the fire could be duplicated either by contacting the company with which *Page 1108 
Mayer Electric had done business or the Birmingham office which kept many of them stored in their computer. He stated that, on February 2, he called appellant's mother and told her that, due to his affair with the appellant, both he and appellant might lose their jobs.
Mr. Richard Payne, an investigator for the State of Alabama, after being qualified as an expert in origins and causes of fires, answered a hypothetical question in the affirmative that falling debris could have caused the "hot spots" in the computer room. He could not state whether the "hot spots" were the points of origin of the fire without having more information. He stated that if the "hot spots" were caused by an accelerant, one other than alcohol would have been used.
Appellant took the stand and recited in substance many of the facts elicited by the state during its case in chief concerning the details of her whereabouts on February 1 and 2. She testified to her affair with Robert Kelly, her planned trip to Pensacola, and her telephone calls to her sister. She admitted returning alone to the Mayer Electric building on February 1. She stated that she left around 11:30 or 12:00 p.m. Appellant denied setting the fire.
Appellant contends that the trial court erred in denying her motions for a directed verdict and a new trial on the grounds that the state did not establish either the corpus delicti or a prima facie case.
The state's evidence clearly established a burning of a building originated by a criminal agency. This establishes the corpus delicti of the crime, which may be proven by circumstantial evidence. Smiley v. State, 376 So.2d 813
(Ala.Cr.App. 1979).
The state's evidence was based primarily on circumstantial evidence. After a careful review of it in light of the appropriate standards, Dolvin v. State, 391 So.2d 133 (Ala. 1980); Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979), we find that the trial court did not err in denying both of appellant's motions. The evidence presented was clearly sufficient for the jury to have reasonably inferred that appellant intentionally damaged the Mayer Electric building by starting a fire. Alabama Code §13A-7-43 (Amended 1977).
Lastly, appellant contends that the trial court committed reversible error during one of its instructions to the jury. In his brief, appellant quotes several isolated statements of the trial court which it made to the jury during breaks in its deliberations. However, appellant directs our attention to only one statement in which the trial court referred to the expense of trying the instant case. We have reviewed the other instances quoted in brief and find nothing prejudicial to appellant.
The jury had been deliberating for over a day and was having difficulty in reaching a verdict when the complained of comments occurred. The trial court had instructed the jury throughout its deliberations as to its role and duty, and without coercion had urged them to reach an agreement. Some time after a lunch break on the last of its over two days of deliberations, the trial court gave a lengthy instruction to the jury during which the complained of comments were made. We quote those challenged portions:
 "I don't want to suggest to you and don't mean to suggest to you that you're not doing your duty. I know that every juror is entitled to his or her opinion but I know that you don't wish to put the State and the public, that's you, to the expense of another trial on the same issues if it can be avoided. . . . I frankly think it's important both to the State and to the Defendant that going to the trouble and expense of a new trial be avoided if it can be done fairly under the evidence. . . . The State has been put, as you already know, to some bit of expense in the trial of the case and I do not feel like releasing you."
Appellant objected to the above comment to which the trial court replied:
"THE COURT: All right. Objection duly noted." *Page 1109 
Initially we note that the trial court's statement was an adverse ruling to appellant's objection and thus preserved the alleged error for our review. Harrison v. Baker, 260 Ala. 488,71 So.2d 284 (1954); Kendrick v. State, 55 Ala. App. 11,312 So.2d 583 (1975).
It is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict so long as it does not coerce or suggest which way the verdict should be returned. McMorris v. State, 394 So.2d 392 (Ala.Cr.App. 1980), cert. denied, 394 So.2d 404 (Ala. 1981); Allred v.State, 390 So.2d 1109 (Ala.Cr.App.), cert. denied,390 So.2d 1114 (Ala. 1980); Lake v. State, 390 So.2d 1088 (Ala.Cr.App.), cert. denied, 390 So.2d 1093 (Ala. 1980). For a summary of authorities see 6B Alabama Digest Criminal Law 865 (1).
It is not error for the trial court to call the jury's attention to the time and expense a new trial would entail.Ashford v. McKee, 183 Ala. 620, 62 So. 879 (1913); Watson v.State, 398 So.2d 320 (Ala.Cr.App., 1980), cert. denied,398 So.2d 332 (Ala. 1981); Poellnitz v. State, 48 Ala. App. 196,263 So.2d 181 (1972).
A careful search of the record reveals no error injuriously affecting the substantial rights of the appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.