The appellant, Chapman Brannon, was convicted of trafficking in cocaine, in violation of § 20-2-80, Code of Alabama 1975, and was sentenced to 99 years' imprisonment. This appeal arises out of appellant's second conviction for trafficking in cocaine. Appellant's initial conviction was set aside and a new trial granted because of the admission of illegal evidence. Seven issues are raised on appeal.
The evidence presented by the State tended to establish that on March 9, 1986, Deputy James Long of the Mobile County Sheriff's Department received information that cocaine transactions were being conducted at 1462 Eagle Drive in Mobile. During the next few days, he staked out the residence at 1462 Eagle Drive as much as time permitted. On March 11, between 7:00 and 8:00 a.m., Deputy Long drove by the residence and saw a black Plymouth vehicle with Florida license plates. He asked Deputy Piggott to run a check on the license registration of that vehicle. The automobile was found to be registered to a Charles Edward Sapp, an individual known to have drug associations in Florida.
Deputy Long then told Deputy Emrich to "stake out" the house at 1462 Eagle Drive. Emrich began the surveillance about 8:50 a.m. that same morning. Emrich was in a blue unmarked van parked in a parking lot across the street from 1462 Eagle Drive. Parked at that residence were a 1978 black Dodge, a 1974 Ford pickup truck, and a blue AMC Hornet. These vehicles were registered to Charles Sapp, Jerry Woodrop, and Margaret Bishop, respectively. At 10:30 that morning, Emrich observed a white female later identified as Margaret Bishop leave the residence at 1462 Eagle Drive in the blue AMC Hornet. She returned at 11:50 a.m. and was assisted in unloading groceries from her car by a bald, white male known to police as Charles Sapp. Deputy Emrich related this information *Page 534 
to Deputy Long minutes later when they met.
After this meeting, Deputy Long returned to the Sheriff's Department. Long then obtained $2,000 in $100 bills from AmSouth Bank, which he marked and photocopied. He also covered the bills with a fluorescent powder which adheres to paper so that when an individual touches the treated surface, the powder sticks to his hand and will show up as a fluorescent color when his hand is placed under a fluorescent light. Long gave this specially marked and treated money to Deputy John Piggot, who was to meet with a confidential informant.
Deputy Piggot gave an informant the money to make contact with a Gerald Neece, and to go with Neece to make a cocaine buy at 1462 Eagle Drive. The informant was equipped with a hidden body microphone, which later proved to be inoperable. Piggott and Special Agent Cliff Brown of the DEA followed the informant to meet Neece. Piggott and Brown were in an unmarked car and were dressed in undercover clothes. They waited for approximately ten minutes and then saw Neece and the informant drive past them in a red and white Ford Thunderbird automobile. Piggott and Brown followed the two at a discreet distance but maintained visual surveillance. After becoming separated from the red and white Thunderbird in traffic, Piggott and Brown again picked up the Thunderbird about a mile from 1462 Eagle Drive. The informant and Neece were still in the car. Piggott and Brown then followed the red and white Thunderbird to 1462 Eagle Drive, where it was stopped and parked.
While Piggott and Brown were following Neece and the informant, Deputy Emrich had left the stakeout about 1:30 p.m. and returned approximately two hours later in a telephone truck. With him was Auxiliary Deputy Rick Drews. They parked the truck across the street and then set up a ladder going up a telephone pole, walked around the area, and pretended to be working on the telephone lines and pole. Around 4:20 p.m., Emrich and Drews saw Neece and the informant drive up to 1462 Eagle Drive in a red and white Thunderbird. Neece went in the residence, came out a few minutes later, and got back into the Thunderbird. Because the informant's body microphone was inoperable, the two officers were unable to hear what occurred inside the house.
Neece backed the car out of the driveway into Eagle Drive, where it "stalled out" in the middle of the street. A man later identified as the appellant Chapman Brannon — on whom law enforcement officials had no information — came out of the house at 1462 Eagle Drive and assisted Neece in pushing the car out of the street and into a nearby parking lot. The men then raised the hood and began working on the car. Deputy Emrich, an eyewitness to this incident, relayed information of it to other surveillance units. Deputy Piggott also witnessed the incident from another vantage point and advised the other units of what he saw. Based on these reports, Deputy Long advised Piggott and the other officers to go ahead and "take them down."
All of the officers involved in the surveillance then converged on appellant and Neece, who were still in the parking lot trying to get the Thunderbird operable. Deputy Piggott and Agents Brown and Odom "hit" on the car and got Neece out of the car and under control. The officers then secured everyone that was in the parking lot — including appellant — and proceeded with their investigation.
Shortly thereafter, Deputy Long left the scene and went downtown to secure a search warrant before Neece or the appellant was searched. While Deputy Long was on his way downtown, Auxiliary Deputy Drews "patted down" the appellant in Deputy Piggott's presence to make sure appellant was unarmed. Drews found a wad of money in appellant's right pants pocket, which he then gave to Piggott. The wad of money consisted of twenty $100 bills, and it appeared to Piggott that it was the marked money which he had supplied to the informant. Piggott asked appellant where he lived and appellant pointed *Page 535 
to the residence at 1462 Eagle Drive. After appellant was frisked, Neece was similarly searched by Deputy Brown, who found a plastic bag in his shoe containing white powder. Piggott relayed this information to Deputy Long by radio. Subsequent testing proved this white powder to be 30.5 grams of cocaine. This evidence was later turned over to Deputy Long.
Deputy Long returned to the scene about 5:00 p.m. with a search warrant, and the searches commenced. Deputies Emrich, Drews, Long, Cliff Brown, James Carter, and Sammy Paul then proceeded to search the residence at 1462 Eagle Drive. During the search, Emrich found a pipe in a bedroom dresser drawer underneath some female clothes, a clear plastic jar under the bed, and another small mug jar on the telephone table in the living room. Both jars contained plant fragments later determined to be marijuana. All of these items found by Deputy Emrich were turned over to Deputy Long. Emrich also observed, but did not seize, a photograph of the appellant and Margaret Bishop.
Meanwhile, Auxiliary Deputy Rick Drews was searching another part of the residence. During his search he found a clear bag containing a white powdery substance in the bottom of a beer lamp. Subsequent testing established this substance to be a mixture of cocaine and insotol. The weight of this substance was 28.5 grams. Drews also found a set of scales in a bedroom closet. He gave both of these items to Deputy Long.
Deputy James Carter, also participating in the search, found a brass straw in a jewelry box in the bedroom of the residence. He turned it over to Deputy Long. Agent Brown found several pipes in a top dresser drawer in the bedroom. This was also turned over to Deputy Long. In addition to all of the items given to him by the other searchers, Deputy Long also found a pie pan containing rolling papers, roach clips, and a homemade pipe. Subsequent examination of the straw, pipes, and pie pan revealed the presence of cocaine (straw) and marijuana (pipes and pie pan) residue.
The last person involved in the search of 1462 Eagle Drive was Deputy Sammy Paul, a canine handler for the Sheriff's Department. Deputy Paul and the department's drug sniffing dog went over the entire residence. The dog "made a hit" on a travel bag located in the bedroom. This bag contained different kinds of pills. These pills, however, were later determined to contain no controlled substances. Officer Paul also found a rent receipt showing that the residence at 1462 Eagle Drive was in the name of Margaret Bishop. These items were also turned over to Deputy Long.
During the search of the house, Margaret Bishop entered the house. When asked who she was, she said she lived there and that her name was Margaret Bishop. Following the search, Bishop, Neece, and the appellant, Chapman Brannon, were arrested and taken downtown for processing.
 I
Appellant first contends that his retrial was barred due to the conduct of the prosecutor during his first trial. The appellant has cited as authority for his position the case ofOregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416
(1982). Our examination of this decision convinces us otherwise.
In Oregon v. Kennedy, supra, the United States Supreme Court held that "the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise tothe successful motion for a mistrial was intended to provoke
the defendant into moving for a mistrial." Id.,456 U.S. at 679, 102 S.Ct. at 2091. (Emphasis supplied.) The Court went on to state that "prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion" would not be sufficient to bar retrial. Id., 456 U.S. at 675-76, 102 S.Ct. at 2089. Indeed, the Court made it clear that it was not electing to adopt a broad rule seemingly suggested by United States v. Jorn,400 U.S. 470, 91 S.Ct. 547, *Page 536 27 L.Ed.2d 543 (1971), and United States v. Dinitz,424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), that retrial may be barred by prosecutorial or judicial "overreaching." Id.,456 U.S. at 678, 96 S.Ct. at 2090.
Here, the appellant has not proven, nor has the trial court determined, that the prosecutor's actions were intended to provoke appellant into moving for a mistrial by attempting to get into evidence part of a statement made by appellant. The prosecutor's attempts to introduce the statement, or some of the contents of it, were prejudicial to appellant. This is insufficient to show intent, because "[e]very act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt." Id.,456 U.S. at 674, 96 S.Ct. at 2088. The prosecutor simply attempted to introduce into evidence a statement made by the appellant — something which any rational prosecutor would try to do. The trial court ruled on its admissibility as a question of law. Obviously, both the prosecutor and the trial court thought there was a reasonable possibility that the statement was admissible because the court received it on the contingency that the prosecutor could show that it was indeed admissible. The court, had it perceived the evidence to be unquestionably inadmissible, could have, and would have, prohibited its admission right then and there. Indeed, had the court done so, there might be some basis for appellant's contention that the prosecutor had intentionally attempted to provoke appellant into moving for a mistrial. The record as it stands, however, is devoid of any such intent by the prosecutor.
In any event, retrial was not barred in the instant case because appellant's motion for mistrial was withdrawn and the conviction in the case was set aside — not declared a mistrial. Moreover, appellant was given the option of having a mistrial declared or waiting for a jury verdict and receiving a new trial should the jury convict him. Even if appellant had opted for a mistrial, he could have been retried, since "a defendant may not use the principle of double jeopardy to relieve himself from the consequences of his voluntary choice."Kinard v. State, 495 So.2d 705, 708 (Ala.Cr.App. 1986); Oliverv. State, 479 So.2d 1385, 1390 (Ala.Cr.App. 1985). Thus, appellant's retrial was not barred based on the principle of double jeopardy.
 II
Appellant next contends that the search of his person by law enforcement officials, which resulted in the discovery of the marked money given to the informant to be used for the purchase of cocaine, was illegal because the officials lacked probable cause or a search warrant.
"Subject to only a few exceptions, the Fourth andFourteenth Amendments of the United States Constitution support the proposition that a search conducted without a warrant issued on probable cause is unreasonable." Sawyer v. State,456 So.2d 114, 115 (Ala.Cr.App. 1984). These exceptions are: (1) plain view, (2) consent, (3) incident to a lawful arrest, (4) hot pursuit or emergency situations, (5) exigent circumstances coupled with probable cause, and (6) stop and frisk situations.Ex parte Hilley, 484 So.2d 485, 488 (Ala. 1985); Dixon v.State, 476 So.2d 1236, 1238 (Ala.Cr.App. 1985).
The State has the burden of proving that the search conducted without a warrant issued on probable cause meets one or more of the exceptions to the general warrant requirement. Sawyer v.State, supra, 456 So.2d at 115; Hall v. State, 399 So.2d 348,353 (Ala.Cr.App. 1981).
In the case at bar, the State apparently contends that the warrantless search of appellant falls within the stop and frisk exception, for it argues that the appellant was lawfully stopped and detained on the authority of Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and § 15-5-30,Code of Alabama 1975. This issue was recently addressed in great detail by this court in Caffie v. State, 516 So.2d 822,825-26 (Ala.Cr.App. 1986), aff'd, 516 So.2d 831 (Ala. 1987), wherein Judge Patterson, writing for the court, stated: *Page 537 
 "In White v. State, 49 Ala. App. 5, 12, 267 So.2d 802, 809 (1972), the court, quoting People v. Navran, 174 Colo. 222, 228-29, 483 P.2d 228, 232
(1971), stated:
 " '[W]e conclude that the authority to make a search without probable cause is limited in the following manner: There must be (a) some reason for the officer to confront the citizen in the first place, (b) something in the circumstances, including the citizen's reaction to the confrontation, must give the officer reason to suspect that the citizen may be armed and, thus, dangerous to the officer or others, and (c) the search must be limited to a frisk directed at discovery and appropriation of weapons and not at evidence in general.' "
After an examination of the record, we conclude that the informant's tip, coupled with the officers' observation of the scene, was sufficient to support the law enforcement officials' conclusion that criminal activity may have been afoot.
Such a conclusion does not end our examination of the officers' actions. Indeed, just as we found in Caffie, supra,516 So.2d at 826-27:
 "A finding that the police had sufficient justification to 'stop' appellant under Terry does not, however, complete our analysis of this issue. As was stated in Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229
(1983):
 " 'This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purposes of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officers suspicion in a short period of time. . . . It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'
 "While it is clear that Terry and § 15-5-30
authorize police authorities to conduct a limited stop and frisk for weapons under appropriate circumstances, on less than probable cause, the scope of a stop is narrowly drawn and limited to situations where the police briefly detain an individual in order to determine who the individual is and to allow the individual to explain any suspicious actions or activities in which he is engaged."
". . .
 "Indicative of the application of these principles is United States v. Tookes, 633 F.2d 712, 715 (5th Cir. 1980), where the court summarized the facts, as follows:
 " '[T]he defendant had been detained on the ground by an officer with pistol in hand. Not only had he been frisked, but he had also been searched from head to toe, even to the removal of his shoes and socks. He had been ordered into the back seat of a government vehicle and was thereafter driven some distance, perhaps even around the block. He testified that he had no doubt that he was not free to go, a reasonable perception in view of the facts mentioned here.'
 "The court held, in Tookes, that '[t]he seizure here went far beyond the limited on-the-street frisk for weapons upheld in Terry v. Ohio.' Id."
We find, therefore, that the appellant's encounter with the law enforcement officials went far beyond the scope ofTerry and § 15-5-30. Appellant was neither questioned concerning his presence at the scene, nor offered the opportunity to explain his activities. Moreover, no information concerning this appellant was discovered during the investigation and corroboration of the informant's tip. The appellant was stopped, searched, relieved of the marked $2,000, and detained by law enforcement officials until after the residence at 1462 Eagle Drive was searched and all of the other suspects were "rounded up." The officers' actions were not sufficiently limited so as to satisfy the requirements of aTerry stop.
Furthermore, there was nothing in the record concerning the officers' justification *Page 538 
for the weapons frisk performed on the appellant. The right to frisk a suspect for weapons is separate from an officer's right to stop a suspect. Under Terry analysis, it is only "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime," that a weapons frisk comes into play. Terry v. Ohio, supra, 392 U.S. at 27,88 S.Ct. at 1883. Moreover, the officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Sibron v. New York,392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). As Judge Patterson pointed out in Caffie, supra, 516 So.2d at 828:
 " 'The "narrow scope" of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked. . . .' Ybarra v. Illinois, 444 U.S. 85, 94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238
(1979). 'It is clear that an officer who has the right to stop a person does not necessarily have a concomitant right to search that person.' [U.S. v.] Post, 607 F.2d [847] at 851. 'To justify a stop and frisk, the government must focus on each person and demonstrate that as to that individual there is a specific cause to fear the justifying harm.' United States v. Davis, 482 F.2d 893, 906 (9th Cir. 1973). In the case sub judice, the State has failed to establish this prong of the Terry analysis; the State falls short of adducing any objective facts which would have given rise to a reasonable belief that appellant might be armed and potentially dangerous. The search of appellant's person was, therefore, unconstitutional and illegal. We recognize that under certain circumstances, for example, where the authorities are dealing with an individual suspected of trafficking in large quantities of narcotics, they may be authorized to automatically frisk the suspect. Travis v. State, 381 So.2d 97, 101 (Ala.Cr.App. 1979), cert. denied, 381 So.2d 102 (Ala. 1980); W. LaFave, Search and Seizure § 9.4(a) (1978). However, the facts of this case fall short of establishing sufficient facts to justify invoking an automatic frisk rule."
It is readily apparent that the authorities in the instant case had no intention of conducting a Terry stop. The testimony indicates that the officers' only concern seemed to be recovery of the marked drug money. Therefore, the "stop and frisk" of appellant cannot be justified under Terry or § 15-5-30.
Because appellant was not free to leave following this stop and search, he was under arrest from this point forward.Caffie v. State, supra, 516 So.2d at 828; Waldrop v. State,462 So.2d 1021, 1028 (Ala.Cr.App. 1984), cert. denied,472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985). Having determined that appellant was arrested, we must now review the record to determine if probable cause existed to support his warrantless arrest.
 ". . . An arrest, or custodial interrogation, not supported by probable cause is violative of the Fourth and Fourteenth Amendments. Dunaway v. New York, supra [442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)].
 " 'An officer has probable cause to make an arrest when, at the time the arrest is made, the facts and circumstances within his knowledge, and of which he has reasonably trustworthy information, are sufficient to lead a prudent person to believe that the suspect is committing or has committed an offense.'
 "Gord v. State, 475 So.2d 900, 902-03 (Ala.Cr.App. 1985)."
Caffie v. State, supra, 516 So.2d at 828-29.
At the time of appellant's arrest, the only facts and circumstances known to the arresting officers were those supplied by the informant's tip and the observations made by Deputies Emrich and Drews of the house at 1462 Eagle Drive. None of this information mentioned the appellant. Nor were any of the vehicles seen at the residence registered to the appellant. Thus, until the time of the arrest, the authorities had no reason to suspect that the appellant was even at the residence. *Page 539 
Moreover, at the time appellant and Neece were taken into custody the officers had no knowledge that a drug buy had been made, as the hidden microphone worn by their informant had malfunctioned and the officers could not hear what was going on inside the house. Mere suspicion in a police officer's mind that an offense has been committed is not enough to justify a warrantless arrest. State v. Calhoun, 502 So.2d 795, 801
(Ala.Cr.App.), aff'd in part, rev'd in part, 502 So.2d 808
(Ala. 1986). An arrest cannot be described as based upon probable cause if the contraband is discovered after the arrest, and the contraband is claimed to be the basis for the arrest. Clifton v. State, 501 So.2d 539, 541 (Ala.Cr.App.),cert. denied, 501 So.2d 541 (Ala. 1986). The officers had no basis for knowing that appellant was involved in the drug buy until after they had frisked him and seized the marked money from his pants pocket. Therefore, appellant's arrest was not based on probable cause, and the money taken from him should have been suppressed. Appellant's conviction based on that evidence cannot stand.
 III
The appellant also argues that the trial court erred in admitting testimony by Deputy James Long that was allegedly hearsay. Deputy Long's testimony concerned information relayed to him by an informant. During the prosecutor's direct examination of Deputy Long, he asked Long if on March 9, 1986, he had "occasion to become involved in the surveillance of a residence at 1462 Eagle Drive," to which Deputy Long answered that he did. The prosecutor then asked him "for what purpose?" Deputy Long's answer that he "had received some information that cocaine dealings —" was interrupted by appellant's counsel objecting on the basis of hearsay. Defense counsel's objection was promptly overruled.
Hearsay testimony consists of an out-of-court statement offered to prove the truth of the matter asserted. Ex parteBryars, 456 So.2d 1136, 1138 (Ala. 1984). However, the prohibition against hearsay testimony applies only to a statement offered to prove the truth of its contents. Tillis v.State, 469 So.2d 1367, 1370 (Ala.Cr.App. 1985). "A statement offered for some other purpose other than to prove the truth of its factual assertion is not hearsay." Thomas v. State,408 So.2d 562, 564 (Ala.Cr.App. 1981).
We find that in the case at bar Deputy Long's testimony was not offered to prove that people were selling cocaine at 1462 Eagle Drive, but rather to show why he initiated a surveillance of the residence at 1462 Eagle Drive. Therefore, his testimony was not barred by the prohibition against hearsay. See McCrayv. State, 548 So.2d 573 (Ala.Cr.App. 1988); Tillis v. State,469 So.2d 1367, 1370 (Ala.Cr.App. 1985).
 IV
Appellant further contends that the trial court erred in not allowing cross-examination as to the identity of the informant who told a law enforcement official that drug transactions were taking place at 1462 Eagle Drive.
 "The general rule is that the prosecution is privileged to withhold from the accused disclosure of the identity of an informant, unless it is essential to the defense set up by the accused and necessary to show their innocence. Hood v. State, 47 Ala. App. 192, 252 So.2d 117 (1971); Davenport v. State, 50 Ala. App. 321, 278 So.2d 769 (1973); Hatton v. State, 359 So.2d 822 (Ala.Crim.App. 1977); Murphy v. State, 367 So.2d 584
(Ala.Crim.App.), cert. denied, 367 So.2d 587 (Ala. 1978); Thornton v. State, 390 So.2d 1093
(Ala.Crim.App.), cert. denied, 390 So.2d 1098 (Ala. 1980), cert. denied, 450 U.S. 998, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). In such a case, the burden is on the accused to show why disclosure of the informant's identity was necessary to show her innocence. Hatton v. State, supra; Thornton v. State, supra. Furthermore, 'mere supposition or conjecture about the possible relevancy of the informant's testimony is insufficient to warrant disclosure.' U.S. v. Hare, *Page 540 589 F.2d 242 (5th Cir. 1979); Gambrel v. State, 405 So.2d 954 (Ala.Crim.App.), cert. denied, 405 So.2d 957 (Ala. 1981)."
Malone v. State, 452 So.2d 1386, 1390 (Ala.Cr.App. 1984).
From our examination of the record, we find it not entirely clear whether the informant who told Deputy Long that drug transactions were taking place at 1462 Eagle Drive was the same individual who was given $2,000 in marked money and who accompanied Gerald Neece to purchase cocaine at 1462 Eagle Drive. If the confidential informant who gave Deputy Long the initial information was a separate person from the one who set up the drug buy, then he was not an active participant in setting up the drug buy. Furthermore, the truth of the information which the informant relayed to Deputy Long was corroborated by undercover surveillance and the development of independent evidence (via the setup to buy drugs). Since appellant failed to show the necessity of the informant's identity for his defense, any questions to Deputy Long which might have led to the discovery of the informant's identity were properly disallowed.
If, on the other hand, the informant who supplied the initial information was the same person who accompanied Gerald Neece to 1462 Eagle Drive to make a drug buy, then appellant might possibly have been entitled to know the informant's identity. However, even if appellant had been entitled to know the informant's identity, the trial court's refusal to allow defense counsel to cross-examine Deputy Long as to the informant's identity would be harmless error. The record reflects that during the cross-examination of Deputy Piggott, the informant's identity was already known by defense counsel and her credibility as an informant was questioned at great length. Therefore, if the informant who supplied the tip and the informant who set up the buy (via Gerald Neece) were the same, appellant suffered no harm, since the identity of the informant was known prior to Deputy Long's cross-examination and the admission of this same evidence would have been merely cumulative.
 V
Appellant also contends that the trial court erred in allowing a law enforcement official to testify that the appellant indicated to the officer that his address was 1462 Eagle Drive before he was informed of his Miranda rights.
Our examination of the record reveals that the following exchange occurred at trial:
 "Q Did you say anything to the Defendant, Chapman Brannon?
"A I asked him where he lived.
"Q What if anything did he respond?
"MR. DEEN: Objection.
"THE COURT: Overruled.
"MR. DEEN: We except.
 "A He pointed to the residence of 1462 Eagle Drive.
 "MR. DEEN: Excuse me. I'm objecting. There's been no predicate.
 "THE COURT: You have noted your objection earlier and it's overruled.
"Q Okay. He pointed to 1462 Eagle Drive?
"A Yes."
As can be seen from the excerpt above, appellant made only a general objection prior to the witness's answer. Specific objections, however, are necessary to preserve error for appellate review. Reeves v. State, 456 So.2d 1156, 1160
(Ala.Cr.App. 1984). A specific objection is necessary because "the trial court must be apprised of the basis for the objection with sufficient particularity to allow an informed decision to be made on the particular legal issues involved."Bland v. State, 395 So.2d 164, 168 (Ala.Cr.App. 1981). "A trial court need not cast about for tenable grounds of an objection."Watkins v. State, 219 Ala. 254, 122 So. 610, 611 (1929); Turleyv. State, 356 So.2d 1238, 1245 (Ala.Cr.App. 1978). Thus, appellant's initial general objection was insufficient to preserve error for appellate review.
Nor is appellant's subsequent, and somewhat more specific objection, sufficient to preserve error, as it came after the prosecutor's question had already been answered *Page 541 
and, thus, was not timely. "[W]here a question is answered before an objection is made, the objection comes too late and the trial court's ruling will not be declared in error without both a motion to exclude the answer and an adverse ruling" thereon. Reeves v. State, supra, 456 So.2d at 1160. Neither occurred here. Therefore, nothing was preserved for our review.
 VI
Appellant's final two contentions of error concern the correctness of the trial judge's oral charge to the jury. Specifically, he argues that the trial court erred in its supplemental instructions to the jury, and that the court coerced a verdict from the jury by giving an Allen charge.
At trial, the jury had a question concerning the elements of constructive possession. As the elements of constructive possession had been previously covered in the court's oral charge, the trial court attempted to clarify its earlier instructions by providing factual examples of actual versus constructive possession. At the conclusion of these supplemental instructions, the jury indicated that it understood exactly what constructive possession was and retired to resume its deliberations. Appellant's counsel then objected to the court's supplemental instruction because the court had neglected to instruct the jury that mere presence was insufficient to establish constructive possession, and that knowledge and the intent to exercise dominion and control over the contraband must be proven in order to establish constructive possession. The trial judge responded that he had covered "all that" in his initial charge, but noted trial counsel's objection. No other objections were made.
Appellant now contends that the court's supplemental charge was highly prejudicial and misleading. He further contends that the court compounded its error by failing to instruct the jury to consider its supplemental charge in connection with all the other instructions contained in the court's initial oral charge.
 "When a jury requests additional instructions the recommended practice is for the trial court to remain within the area of the specific request in making his response. East v. State, 339 So.2d 1104, 1106-07 (Ala.Cr.App. 1976). A trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury. White v. State, 195 Ala. 681, 686, 71 So. 452
(1916); Thomas v. State, 393 So.2d 504, 508
(Ala.Cr.App. 1981)."
Davis v. State, 440 So.2d 1191, 1195 (Ala.Cr.App. 1983), cert.denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984).See also Thomas v. State, 455 So.2d 278, 281 (Ala.Cr.App. 1984).
We find that the trial judge's supplemental charge was neither incorrect nor misleading. The court was trying to answer the question as simply and plainly as possible, so as not to further confuse the jury. Contrary to appellant's contentions, there was no need for the court to reinstruct the jury on all of the elements of constructive possession that were covered at length in the initial oral charge. Indeed, such action by the trial court would have, in all likelihood, only added to the jury's confusion. Therefore, the court's supplemental charge does not constitute grounds for reversal by this court.
Neither does the fact that the trial court failed to instruct the jury that it was to consider its supplemental instructions in connection with the rest of the charge constitute reversible error. First of all, this omission was not objected to at trial, and, therefore, was not preserved for this court's review. See Wyrick v. State, 409 So.2d 969 (Ala.Cr.App. 1981). Therefore, it is too late now for appellant to object to the failure of the trial court to inform the jury that the supplemental charge should have been considered in connection with the prior oral charge. Moreover, although the case of Bellv. State, 473 So.2d 622, 624 (Ala.Cr.App. 1985), states that "the court should admonish the jury that the additional instructions must be regarded with all the other instructions given," the opinion goes on to state that "that principle is not ironclad." "It is assumed that the jury will consider the previously given instructions *Page 542 
along with those given in the supplemental charge." Davis v.State, supra, 440 So.2d at 1195. Therefore, no error occurred.
Appellant further contends that the trial court gave a "dynamite" or Allen charge which he says was coercive and, thus, warrants reversal of his conviction on appeal. We disagree.
 "The term 'dynamite charge' has often been used interchangeably with the expression 'Allen charge,' which is derived from Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). In Allen the Supreme Court set forth the principles that govern the question whether a trial court's instructions encouraging a jury to arrive at a unanimous verdict exceeded the bounds of permissible instructions by coercing the jury into reaching a unanimous verdict which the jury would probably not have rendered but for such coercion."
Franklin v. State, 502 So.2d 821, 827 (Ala.Cr.App. 1986), writquashed, 502 So.2d 828 (Ala. 1987). As this court has previously stated:
 "No error is committed in supplemental instructions, including the 'Allen' or 'dynamite' charge, unless it is threatening or coercive in the language used. Lake v. State, 390 So.2d 1088, (Ala.Cr.App. 1980); Ala.Dig. Criminal Law, Key No. 865(1).
 "It is not error for the trial court to call the jury's attention to the time and expense a new trial would entail. Poellnitz v. State, 48 Ala. App. 196, 263 So.2d 181 (1972); Watson v. State, 398 So.2d 320 (Ala.Cr.App. 1980); Galloway v. State, 416 So.2d 1103 (Ala.Cr.App. 1982)."
Wiggins v. State, 429 So.2d 666, 669 (Ala.Cr.App. 1983).
After an examination of the challenged instruction, we find that the trial court's charge was neither threatening nor coercive, and therefore, that no error prejudicial to the appellant resulted therefrom.
However, for the reasons discussed above in part II, this cause is reversed and remanded to the circuit court for proceedings not inconsistent with this opinion. We would further note that while the question of the sufficiency of the evidence against appellant was not presented to us on this appeal, the circuit court might wish to closely consider this issue on remand.
REVERSED AND REMANDED.
All the Judges concur.