WELCH, Presiding Judge.
Bryan Pettibone was convicted of four counts of enticing a child for immoral pur *98 poses, violations of § 13A-6-69, Ala.Code 1975; three counts of second-degree sexual abuse, violations of § ISA-6-67, Ala.Code 1975; and one count of attempted second-degree sexual abuse, a violation of §§ 13A-6-67 and 13A-4-2, Ala.Code 1975. For each of the four enticement convictions, the trial court sentenced Pettibone to serve five years’ imprisonment. For each of the three second-degree-sexual-abuse convictions, the trial court sentenced Pettibone to one year in prison. For the attempted second-degree-sexual-abuse conviction, the trial court sentenced Petti-bone to six months’ imprisonment. No posttrial motions were filed. This appeal followed.
Initially we note that Pettibone’s first trial resulted in a mistrial on March 3, 2010. Pettibone’s second trial commenced on May 3, 2010, and the following evidence was presented at the second trial. The State presented evidence that during the 2008-2009 school year at Central Baldwin Middle School, Pettibone, who was a teacher and basketball coach, had inappropriate physical relations and communications with four female students: B.B., M.D., D.S., and K.B.
B.B. testified to the following. During the seventh and eighth grade, B.B. attended Central Baldwin Middle School, and during her eighth-grade year she was a cheerleader for the basketball and football teams. On a Friday, the date of which was unspecified at trial, in B.B.’s eighth-grade year, she was standing at her locker when Pettibone approached her and asked, “When are you going to call me?” (R. 279.) B.B. said, “Never.” (R. 279.) B.B. said that they were joking around, and Pettibone gave her his number. When B.B. did not telephone Pettibone over the weekend, Pettibone approached her at school on Monday and asked why B.B. had not called him. B.B. gave Pettibone her number, and they began text messaging one another.
At a certain point, Pettibone began text-ing B.B., “1-2-3,” which meant “I love you.” (R. 281.) B.B. testified:
“We were on the way to a basketball game one day and we were texting and he told me to look at him and lick my lips sexy-like and look at his arms, how big they were and stuff like that. And then one time, on the way, he told me that he was horny and to come fix it.”
(R. 282.)
B.B. testified that Pettibone licked his lips at her while she was sitting on the seat of the bus, and Pettibone stood in the aisle flexing his muscles at her. B.B. stated that Pettibone told her on the phone that he had heard that B.B. had been “fingered” by one of her previous boyfriends and asked if he could also do the same. (R. 283.) B.B. told Pettibone that he could not. B.B. testified that she and Pettibone also began hugging side-to-side but testified that one day Pettibone sent her a text message and stated that “he didn’t want no more of that side crap, he wanted a real hug, like face-to-face.” (R. 284.) B.B. further testified,
“He asked me if he could kiss me and I was, like, I don’t know. He asked me, like of a certain number from, like, one to ten. I give him a number. I can’t remember what it was. He asked if there was any chance of a tongue kissing and I responded I don’t know still.”
(R. 285.)
B.B. also stated that, in one instance, she was alone with Pettibone in his classroom, and Pettibone locked the door to the room, began telling her how much he cared for her, and kissed her on the cheek. Pettibone and B.B. were already done talking when the custodian unlocked the door and came in the classroom. Petti- *99 bone also began putting “1-2-3” messages in B.B.’s locker. B.B. stated that she and Pettibone began talking on the phone or text messaging one another all day long and also talked from approximately 9:00 p.m. to 1:00 a.m. B.B. stated that her mother, D.B., confronted her about talking to a person at a certain telephone number too often and for too long. When D.B. asked whose phone number it was, B.B. told her that it belonged to someone other than Pettibone.
At that point, B.B. told Pettibone that her mother was getting suspicious, ánd Pettibone purchased a cell phone for B.B. Pettibone also sent B.B. a text message and asked her to meet him somewhere during a basketball game, but B.B. did not meet with him.
D.B. testified to the following. D.B. testified that B.B. had her own cell phone and that she noticed that B.B. began talking on the phone later at night until approximately 12:00 or 1:00 a.m. D.B. testified that B.B. began talking in her bedroom with the door locked when B.B. had not done so previously.
Peggy Johnson, the custodian at Central Baldwin Middle School, testified to the following:
“One day I had gone to clean [Petti-bone’s] room and the door was locked and normally his door was not locked. And I used my key and I got in. And I flipped the light on and I really didn’t pay any attention and I got busy. And out of the right — my eyesight on the right, I saw movement, and as I looked, Mr. Pettibone and a white student were coming from the right corner of the room headed up front.”
(R. 446.)
Johnson stated that she later determined that the student was B.B.
The State presented evidence indicating that in December, the principal, Mike Vi-var, D.B., and B.B. met in Vivar’s office. B.B. showed D.B. and Vivar the cell phone Pettibone had purchased for her as well as notes Pettibone had written her. Cellphone records were admitted into evidence, and the records reflected that B.B. and Pettibone had been talking on the phone late at night in December 2008. The State also presented evidence indicating that B.B.’s cell phone contained a text message conversation between Pettibone and B.B. wherein they discussed hugging and kissing each other.
Shayla Hollowell, a teacher and the cheerleading coach at Central Baldwin Middle School, testified to the following. Hollowell testified that Pettibone would wait for B.B. to come out of Hollowell’s classroom three or four times a week and that Pettibone and B.B. would talk to one another in close proximity. Because Hol-lowell had “personal suspicions” about the situation toward the end of B.B.’s seventh-grade year, she asked the assistant principal that B.B. not be placed in Pettibone’s science class for her eighth-grade year. (R. 405.)
Hollowell testified that D.S. videotaped school athletic events for Pettibone and that she saw D.S. and Pettibone walking toward Pettibone’s classroom several times after home and away games between 8:00 and 9:30 p.m., depending on when the games were over.
D.S. testified to the following. D.S. testified that she attended Central Baldwin Middle School and that she was the scorekeeper for Pettibone during basketball season. D.S. was also in Pettibone’s science class in the eighth grade. D.S. testified that she and Pettibone would meet before or after basketball games either in Pettibone’s classroom, in a closet in his classroom, or in the locker room. D.S. *100 also testified that she and Pettibone would meet in the coach’s office during basketball games. D.S. testified that she and Petti-bone kissed one another on multiple occasions and that Pettibone touched her back, buttocks, and stomach over her clothes. In one incident, Pettibone placed D.S.’s hand on his genitals over his clothes. Pet-tibone and D.S. would talk on the phone, text one another, and Pettibone told D.S. that he loved her, using the number “1-2-3.” (R. 565.)
Leigh Rogers, a teacher at Central Baldwin Middle School, testified to the following. Rogers testified that she was the eighth-grade girls basketball coach and seventh-grade girls volleyball coach. Rogers testified that after the teams returned from basketball trips, she would stay outside to ensure that all the girls were picked up by their parents, and Coach Theresa Schreck would ensure that all the girls were out of the locker room. On one particular night during the 2007-2008 school year, Rogers was under the impression that all the girls had already gone home, and Schreck and Rogers were outside talking when they saw D.S.’s mother arrive. D.S. then emerged from the building and told Schreck and Rogers that she had been in “Pettibone’s room” watching the game film. (R. 427.)
Theresa Schreck, a teacher and girls basketball and volleyball coach at Central Baldwin Middle School, testified to the following. Schreck testified that she had seen D.S. go to Pettibone’s classroom on numerous occasions and that D.S., who was in Schreck’s physical-education class, would bring Schreck notes indicating that she was going to Pettibone’s classroom to grade papers. Schreck testified, “The notes started becoming, you know, habitual and so I told her she could no longer go up there because I didn’t feel that there were that many papers to be graded for it to be an everyday occurrence.” (R. 438.)
M.D. testified to the following. M.D. testified that she attended Central Baldwin Middle School and that she and Petti-bone began text messaging one another when she was in the eighth grade. M.D. stated that they discussed kissing and that Pettibone would invite her to his classroom to grade papers for him. In one instance, when M.D. entered the classroom, Petti-bone pointed to a table in the corner and told M.D. to go sit at the table. The door to the classroom was locked, and Pettibone began kissing M.D. Pettibone kissed M.D. with an open mouth, put his hands under her shirt but not under her bra, and put his hands between M.D.’s thighs. M.D. testified that Pettibone touched her private area over her clothes. M.D. testified that she could see that Pettibone had an erection.
K.B. testified to the following. K.B. attended Central Baldwin Middle School and kept score at basketball games for Schreck and Pettibone. K.B. was also in Petti-bone’s science class. K.B. and Pettibone began text messaging each other and discussed kissing, hugging, and possibly going further physically. KB. testified that she and Pettibone began meeting in the coach’s office and began hugging and kissing. Pettibone also touched K.B.’s breasts over her clothes. Pettibone also turned K.B. around and pressed his penis against K.B.’s buttocks while Pettibone had an erection.
I.
Pettibone argues on appeal that the convictions that resulted from his second trial in May 2010 violate the Double Jeopardy Clause because his first trial ended in a mistrial and that he should not have been prosecuted in a second trial. Specifically, Pettibone argues that the prosecution *101 goaded the defense into moving for a mistrial because the prosecution presented the testimony of D.S. as to new allegations of abuse that were not part of the underlying indictment.
Initially, we note that before this second trial, Pettibone was tried in March 2010 for enticing and abusing D.S., M.D., K.B., and B.B.; however, Pettibone’s first trial resulted in a mistrial. During Pettibone’s first trial, D.S. testified that Pettibone made her touch his genital area outside his clothes, and before trial, the defense was unaware that D.S. would present this testimony. (Third Supplemental Record at 12, 26-27.) After D.S. testified and was cross-examined, the defense moved for a mistrial and argued that it had no notice of this particular testimony and argued that the testimony was highly prejudicial. In response, the prosecutor stated that he did not know until the day of trial that D.S. would testify that Pettibone made her touch his genitals, but the defense was not told on the day of trial prior to D.S.’s testimony that D.S. would so testify. (Third Supplemental Record at 28, 39.) The trial court questioned D.S. about when she had told the prosecution about this particular instance of abuse, and D.S. confirmed that she did, in fact, only notify the prosecution about the act on the day of trial. Outside the presence of the jury, the trial court stated the following in making its ruling,
“THE COURT: Okay. After thinking about this over lunch, the testimony by [D.S.] is of such a character and nature that it substantially changes the evidence that’s being presented, not necessarily 404(b) as the defense mentioned, but to a critical element in the crime.
“And I could probably give a curative charge to the jury. One of the things I thought about doing was maybe removing the three counts that dealt with [D.S.], removing that and telling the jury not to — Mr. Simpson [prosecutor], this is — if you make another action like that in my court, we will be having a contempt hearing.
“MR. SIMPSON: Yes, sir.
“THE COURT: Unfortunately, the information is still there and I could see how the jury could get back there even though they weren’t considering the [D.S.] charges and still holding that piece of evidence in their consideration of the other charges that Mr. Pettibone would be facing with them. And it’s just to a point that I don’t — I don’t see how I can do anything else but declare a mistrial.
“I will note — and the reason I wanted to talk to the last witness again was it is clear that this information was not known to the State in any way until first thing this morning, although I believe the prudent thing for the State to have done would be to advise the defense prior to us coming into court or had it been a surprise to the State during the middle of the trial, that the State should have asked for a sidebar or a short recess for us to discuss it.
“Nevertheless, I don’t see anything— that the State knew about it and did not provide to the defense willfully or intentionally. They just found out about it first thing this morning. So — but that being said, it’s, you know—
“MR. SIMPSON: Your Honor, may I make an argument—
“THE COURT: No, you may not. I heard the arguments from both sides before lunch and my ruling is that I am declaring a mistrial.”
(Third Supplemental Record at 38-39.)
As best we can discern, Pettibone seems to argue that the statements that B.B., D.S., M.D., and K.B. submitted to law *102 enforcement after the first trial (C. 49-56), contained additional allegations of which the prosecution was aware during the first trial, and the prosecution wanted the first trial to end in a mistrial so that the prosecution could begin a new trial using these additional allegations.[1] Finally, Pettibone argues that the trial court erred in failing to submit a question to the jury on whether the prosecutor goaded the defense into moving for a mistrial.
Here, the defense filed a pretrial motion to invoke the Double Jeopardy Clause and to have the second case dismissed and requested that the recently obtained statements of the victims not be entered into evidence. (C. 45-48.) Defense counsel requested that the trial court empanel a jury to determine if the prosecution in Petti-bone’s first trial did, in fact, goad the defense into moving for a mistrial. (C. 46.) In addition, the trial court conducted a pretrial hearing on the motion, after which it denied the motion. (R. 26.)
Double-jeopardy principles protect a criminal defendant from being tried repeatedly for the same offense. Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In Oregon v. Kennedy, the United States Supreme Court determined the circumstances under which a mistrial granted on a defendant’s motion would bar a second trial. The Court stated:
“We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.”
456 U.S. at 679.
This Court has stated:
“ ‘The double jeopardy clause forbids the government to try a person twice for the same crime. If after a criminal trial begins the government decides that the case is going badly for it, it cannot dismiss the case and reprosecute the defendant. Nor is it permitted to achieve by indirection what it is not permitted to do directly; and thus it cannot engage in trial misconduct that is intended to and does precipitate a successful motion for mistrial by the defendant. Oregon v. Kennedy, 456 U.S. 667, 676 (1982). The requirement of intent is critical, and easily misunderstood. The fact that the government blunders at trial and the blunder precipitates a successful motion for a mistrial does not bar a retrial. Id. at 674-76. Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1972); United States v. Powell, 982 F.2d 1422, 1429 (10th Cir.1992); United States v. Perez Sanchez, 806 F.2d 7 (1st Cir.1986). Yet the blunder will almost always be intentional — the product of a deliberate action, not of a mere slip of the tongue. A prosecutor who in closing argument comments improperly on the defendant’s failure to have taken the stand, thus precipitating a mistrial or a reversal on appeal, is no doubt speaking deliberately, though his judgment may be fogged by the heat of combat. But unless he is trying to abort the trial, his misconduct will not *103 bar a retrial. It doesn’t even matter that he knows he is acting improperly, provided that his aim is to get a conviction. Oregon v. Kennedy, supra, 456 U.S. at 675-76. The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means.’ ”
“United States v. Oseni, 996 F.2d 186, 187-88 (7th Cir.1993).”
Spears v. State, 647 So.2d 15, 21-22 (Ala. Crim.App.1994) (some citations omitted).
In Brannon v. State, 549 So.2d 532 (Ala. Crim.App.1989), this Court held that in order to bar a second trial on double-jeopardy grounds the defendant must make a showing that the prosecutor intended to provoke a motion for a mistrial. In Brannon, this Court stated:
“Here, the appellant has not proven, nor has the trial court determined, that the prosecutor’s actions were intended to provoke appellant into moving for a mistrial by attempting to get into evidence part of a statement made by appellant. The prosecutor’s attempts to introduce the statement, or some of the contents of it, were prejudicial to appellant. This is insufficient to show intent, because ‘[ejvery act on the part of a rational prosecutor during a trial is designed to “prejudice” the defendant by placing before the judge or jury evidence leading to a finding of his guilt.’ [Oregon v. Kennedy], 456 U.S. at 674, [102] S.Ct. at 2088. The prosecutor simply attempted to introduce into evidence a statement made by the appellant— something which any rational prosecutor would try to do. The trial court ruled on its admissibility as a question of law. Obviously, both the prosecutor and the trial court thought there was a reasonable possibility that the statement was admissible because the court received it on the contingency that the prosecutor could show that it was indeed admissible. The court, had it perceived the evidence to be unquestionably inadmissible, could have, and would have, prohibited its admission right then and there. Indeed, had the court done so, there might be some basis for appellant’s contention that the prosecutor had intentionally attempted to provoke appellant into moving for a mistrial. The record as it stands, however, is devoid of any such intent by the prosecutor.”
549 So.2d at 536.
By contrast, in Ex parte Adams, 669 So.2d 128, 132, 130 (Ala.1995), the Alabama Supreme Court held that Adams “presented substantial evidence that the first mistrial was due to the prosecutor’s intentional misconduct” and raised “factual, not legal, questions about whether the prosecutor acted improperly and intentionally to provoke the first mistrial.” In Adams, the Court stated:
“This case is unlike Brannon, supra, in that, here, the trial court immediately stopped the proceedings and declared a mistrial based on the prosecutor’s question. There is no evidence in the record that the prosecutor was prepared to submit proof that the defendant had ever made the statement the prosecutor asked about. There is no indication in the record that the prosecutor, in any subsequent motion or proceeding, was prepared to show that the question as to the defendant’s statement had a factual basis. Under these circumstances, the prosecutor’s actions during the first trial could support an inference that he intended to provoke a mistrial by presenting an inflammatory statement in the context of a question without factual support. The Court of Criminal Appeals has stated that ‘where the appellant’s motion for mistrial is prompted by *104 judicial or prosecutorial error intended to provoke the motion’ or is otherwise prompted by bad faith actions taken by the prosecutor in an attempt ‘to harass or prejudice the defendant, then double jeopardy considerations may act to bar retrial.’ Oliver v. State, 479 So.2d 1385, 1390 (Ala.Crim.App.1985), citing Lee v. United States, 432 U.S. 23, 33-34, 97 S.Ct. 2141, 2147-48, 53 L.Ed.2d 80 (1977).”
Ex parte Adams, 669 So.2d 128, 131 (Ala. 1995).
In Ex parte Taylor, 720 So.2d 1054 (Ala. Crim.App.1998), law enforcement testified at trial that a confidential informant had been wearing a recording device when he spoke with Taylor. Before trial, the prosecution had been told that this audiotape was of poor sound quality. However, a mistrial was declared because the State failed to disclose the existence of the tape to the defense. The trial court denied Taylor’s motion to dismiss the indictments, made on the ground that the State had intentionally suppressed the audiotape to invoke a mistrial, thus barring a retrial. After considering Taylor’s petition for a writ of mandamus to review the trial court’s ruling, this Court denied the petition and held:
“The prosecutor stated that she did not know about the tape and that she believed that the police officers did not tell her about it because they did not think it would be useful — ‘you can’t make out any voices or words.’ Judge Bahakel, when granting the motion for a mistrial, stated, T don’t really fault the prosecutors in this particular case; they’re good attorneys, and I think they’re diligent attorneys.’ We also note that codefen-dant Brown’s attorney observed, T tend to believe [the prosecutor] that they just got this tape, and it came out on the witness stand without Mr. Clark [Taylor’s counsel] and I knowing anything about [it].’ There is absolutely no evidence in the record that the prosecutor’s actions were ‘intended to “goad” the defendant into moving for a mistrial.’ In fact, the prosecutor vigorously argued that a mistrial was not warranted in this case.”
720 So.2d at 1056.
Here, Pettibone has failed to present sufficient evidence or to raise an inference that the prosecution goaded him into making a motion for a mistrial. When it granted the defense’s motion for a mistrial the trial court did not find that the prosecution had engaged in misconduct. Rather, the trial court found that on the day of trial D.S. made the additional allegation that Pettibone made her touch his penis through his clothes. In addition, the record contains D.S.’s testimony that she told the prosecution only on the day of trial that this act had occurred. Although the trial court chided the prosecution for not alerting the defense to this additional evidence at the time it was discovered, the trial court absolved the State of any wrongdoing in presenting the testimony of D.S., a minor child-victim in this case, who subsequently changed her testimony as to Pettibone’s acts of abuse. Certainly it is entirely possible that child-victims may change their testimony between the time a case is initially investigated and the time of trial, particularly in cases of sexual abuse. The trial court declared a mistrial because it stated that D.S.’s testimony was pertinent to a “critical element of the crime” and that a curative instruction would not alleviate the prejudice created by her testimony.
In addition, not only did the prosecution not goad the defense into making a motion for a mistrial, but it is apparent that the prosecution vigorously opposed the trial court’s declaration of a mistrial. Once the *105 trial court had actually declared a mistrial, the prosecution attempted to present additional argument on the motion, and the trial court prevented it from doing so. Unlike the prosecution in Adams, the prosecution in Pettibone’s case presented D.S.’s testimony in the good-faith belief that D.S. was being truthful. D.S.’s testimony was not presented to harass Petti-bone and was not inflammatory.
Finally, we note that D.S.’s testimony regarding the new allegations was admissible at Pettibone’s second trial for reasons discussed in greater detail later in this opinion.
Pettibone argues that the prosecution goaded him into moving for a mistrial so that the prosecution could obtain additional statements from the remaining victims B.B., K.B., and M.D. to support additional allegations of abuse. However, Pettibone has not presented this Court with any portions of the trial transcript from the first trial that contain testimony from these three victims. Therefore, Pettibone has not supplied a sufficient record as to this particular argument. Further, we question whether the statements these victims made after the first trial but before the second trial, which Pettibone presented as evidence during the hearing on this motion, are relevant as to whether the prosecution goaded the defense into making a motion for a mistrial. Pettibone apparently bases this argument on the theory that the first trial was not progressing favorably for the State and that the State presented D.S.’s testimony in an attempt to obtain a mistrial and a chance at a second trial. However, Pettibone did not present arguments or evidence that the first trial was, in fact, going poorly for the State.
Therefore, because Pettibone did not present substantial evidence showing that the prosecution goaded the- defense into moving for a mistrial, Pettibone is not entitled to relief upon this claim.
II.
Pettibone argues that the trial court erred in denying his Batson[2] motion. Specifically, Pettibone argues that he made a prima facie showing of racial discrimination at trial and that the State failed to provide race-neutral reasons to support its strikes of two black venire-members. However, Pettibone conceded in the trial court that the State had race-neutral reasons for one of the strikes. After the jury was struck, the following occurred:
“MR. BOLTON [defense counsel]: Your Honor, we had 42 jurors initially. A number were struck for cause. We actually then struck from 37. Of the 37 jurors, three jurors were African-American. The State struck as its fourth strike Juror No. 17 who was an African-American. The State as its seventh strike struck Juror No. 24 which was an African-American. The defendant struck Juror No. 40 who was an African-American who was the former Baldwin County sheriffs investigator child protective worker, so forth. Now, the State struck two of the three remaining African-Americans which left the jury with no African-Americans.
“Counsel would concede that the strike of Juror No. 17, that the State probably had some race-neutral reasons. Counsel — based on the answers of Juror No. 24, ..., her answers were such that any strike of her would have been a racial strike in that there was no race-neutral reasons for striking juror No. 24 *106 and would move to dismiss the panel under the Batson challenge.
“MR. SIMPSON [prosecutor]: No. 1, I don’t think he’s met the burden and there’s three and he struck one of them. I don’t see how that would show me a race-neutral reason.
“No. 2, with respect to No. 24, there were two reasons why I struck her. She cleans the Office of Matthew Rone and I’ve had a very contentious case with him and I don’t like Matthew Rone and Matthew Rone doesn’t like me and we know that. I know he’s defended the case that we’ve had diligently.
“Second, I’ve seen her sleeping in the courtroom during jury selection yesterday.
“MR. BOLTON: She is a cleaning person who cleans Matthew Rone’s office. She doesn’t work in his office. She’s not a legal — involved in any of. the legal process. She has a daughter who works with the court system in Mobile. She answered no other questions and I certainly never saw her sleeping.
“THE COURT: Okay.
“MR. BOLTON: Don’t think that reason is race-neutral.”
(R. 241-243.)
Here, the trial court’s response “okay” to Pettibone’s Batson motion does not constitute an adverse ruling. See, e.g., Davenport v. State, 653 So.2d 1006 (Ala. Crim.App.1994) (trial court’s response of “thank you” following defense counsel’s objection to failure to give a requested jury instruction not considered an adverse ruling); Seay v. State, 479 So.2d 1338 (Ala. Crim.App.1985) (trial court’s response of “thank you” not an adverse ruling); Hammond v. State, 502 So.2d 843 (Ala.Crim. App.1986) (trial court’s response of “all right” does not constitute an adverse ruling); and Stone v. City of Huntsville, 656 So.2d 404 (Ala.Crim.App.1994) (trial court’s response of “very well” to defendant’s objection did not constitute an adverse ruling). “Where there is no ruling adverse to the defendant and no objection to the court’s failure to rule, the issue is procedurally barred from appellate review.” King v. State, 595 So.2d 539, 542 (Ala.Crim.App.1991). Thus, this issue was not preserved for appellate review.
Moreover, to the extent that the trial court’s failure to grant the motion can be considered an adverse ruling, Pettibone is not entitled to relief. He has not shown that the prosecution’s reasons for striking the veniremember were not race-neutral. See Mitchell v. State, 579 So.2d 45, 49 (Ala.Crim.App.1991) (“The fact that a veniremember appears to be inattentive or ‘dozing’ during the proceedings is another valid reason for striking.”).
III.
Pettibone argues on appeal that the trial court erred in admitting evidence in violation Rule 404(b), Ala. R. Evid., because the State did not give Pettibone pretrial notice of the evidence and because the State failed to lay a proper foundation for the evidence. In addition, Pettibone argues that the evidence was substantively inadmissible.
However, it is unclear from Pettibone’s brief on appeal which evidence he alleges was improperly admitted. Pettibone cites to portions of the record that include a hearing on Rule 404(b), Ala. R. Evid., evidence regarding the testimony of D.S. and KB. (R. 36-41), and in his reply brief Pettibone states that there is a detailed discussion of changed allegations in the statement-of-the-facts section in his initial brief. In this section, Pettibone alleges that K.B., B.B., D.S., and M.D. changed their allegations from what they testified *107 to during the first trial to what they testified to in the second trial.
As best we can discern, Pettibone appears to contend on appeal that the differences between what the girls testified to during the first trial and what they stated in their written statements come under the guise of Rule 404(b) as collateral acts. (C. 49-56.) Yet he still does not identify what specific testimony should have been prohibited, and, more importantly, he failed to make this proffer to the trial court. Therefore, we may not consider claims that Pettibone did not argue to the trial court, other than those allegations regarding D.S. and K.B., which Pettibone discussed at a pretrial hearing. (R. 36-41.) Although we seriously question whether Pettibone has complied with Rule 28(a), Ala. R.Crim. P., because he failed to allege specific facts in support of this argument, out of an abundance of caution, we will address the argument presented at trial as to D.S. and KB. (Pettibone’s brief at 49.)[3]
Pettibone’s first trial began on March 1, 2010, and resulted in a mistrial on March 8, 2010. On March 4, 2010, all four girls gave written statements to the prosecution as to the events that occurred between each of them and Pettibone. (R. 28.) During a pretrial hearing, the State stated that the allegations of abuse proffered by D.S. and K.B. had changed from the first trial to the second trial. (R. 34.) Specifically, in the second trial D.S. stated that Pettibone made her touch his penis, and KB. stated that Pettibone turned her around and pressed his penis to her buttocks. (R. 34, 41.) The State argued during the hearing that it would use one incident wherein Pettibone touched D.S.’s buttocks and kissed her as the incident for which Pettibone was actually charged for violating the second-degree-sexual-abuse statute and use the incident wherein Petti-bone made D.S. touch his penis as evidence under Rule 404(b), Ala. R. Evid. (R. 41.) It appears from the record that the trial court admitted KB.’s statement that Pettibone pressed his penis to her as Rule 404(b) evidence in addition to instances she had already stated occurred in the first trial. (R. 41.)
The following occurred at the hearing as to D.S.:
“MR. BOLTON [defense counsel]: Wait a minute. They’ve not provided any [Rule] 404(b). They’ve got to provide 404(b) in writing and they’ve not provided any 404(b) in writing. And, you know, it’s five minutes after ten and we’re fixing to go to trial.
“MR. SIMPSON: He’s had these statements.
“THE COURT: I disagree. Yeah. It wasn’t attached to a motion that says here is the 404(b) that we’re providing but the statements were provided. The defense — maybe Mr. Pettibone is not but his attorney is well aware that they’ve g;ot proof of a specific instant, not a generality.
“So the other matters would be 404(b) and I can charge the jury that they cannot use the other instances as basis for a conviction, that they must consider the actual specific instance alleged. That’s why—
“MR. BOLTON: Of course, you’re going to let them' both in now. One is 404(b)—
[[Image here]]
*108 “THE COURT: All right. The answer — I think the last question you said was so the Court’s going to allow it both [sic] in, the answer is yes.
“MR. BOLTON: Okay. Well, just let me do this, we’re expanding this thing much further than I anticipated. I would make a motion under Rule 16.4[, Ala. R.Crim. P.,] of protective order in violation of the discovery. First of all, these new items have been provided, you know, a month before the trial which is not sufficient time.
“Second of all, if the Court is now going to allow the old instances that the State alleged and that the grand jury heard is now 404(b), we—
“THE COURT: Let me back up, some of it’s not 404(b). Some of it goes directly to the solieitation[4] charge. If you’re talking about old evidence, I’m not sure—
“MR. BOLTON: — the old incident of the alleged sexual abuse.
“THE COURT: Okay. That’s—
“MR. BOLTON: The old allegations of what they argued to the jury last time is these are the evidence of sexual abuse.
“THE COURT: Since it wasn’t set out in the indictment, I don’t know what the old indictment was.
“MR. BOLTON: What they argued to the jury the last time. I mean, you know, Your Honor was here with us.
“MR. SIMPSON: We’re not required to make the same argument to the jury no more than Mr. Bolton is.
“MR. BOLTON: Well, the thing is I made a specific motion for 404(b) material, and when they got this stuff, if they intended back in March to say, okay, we’re now going to change what we say is the basis of the indictment to the new stuff and the old information is going to be 404(b), 404(b) in the Alabama Rules of Evidence says that the prosecutor in a criminal case shall provide reasonable notice in advance of trial.
“Now, we’re talking about just a matter of hours and I realize that they gave me the new stuff but there’s nothing since March 4 when they get the stuff that they’re now going to take, quote, the old incidents that the grand jury heard is the basis for the indictments and now make that 404(b) and use it all.
“And that certainly is not in advance of — not reasonable notice in advance of trial, and I would ask under Rule 16.4 that Your Honor not allow that to happen but to grant a protective order in violation of the discovery rules which Your Honor has granted and not allow them to now just multiply this case by taking the old instances making it 404(b) and the new instances which is now the basis of the indictments which is obviously not true since the grand jury never heard it.
[[Image here]]
“THE COURT: .... the foundational basis of the charge cause the charge that the grand jury indicted on was— I’m going to use generic terms — the touching of the rear end. Am I not correct? That was the basis as to two of the girls. The basis of the sexual abuse charge was the touching by the defendant of the girls’ bottom.
“MR. SIMPSON: That was only one girl. That was [D.S.] who testified.
[[Image here]]
“MR. SIMPSON: Okay. To resolve this issue, the State will go forward under the touching of the butt as sexual abuse that was given to the grand jury *109 and the State would offer the touching of the penis as 404(b).
[[Image here]]
“MR. SIMPSON: As to [D.S.].”
(R. 35-41.)[5]
Rule 404(b), Ala. R. Evid., states:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
A. Notice
Here, Pettibone had been aware that D.S. changed her allegations from the date that the first trial resulted in a mistrial on March 3, 2010. The record is clear that the prosecution, defense, and trial court all became aware on this date that D.S. had stated that Pettibone had committed an additional act of abuse against her. Therefore, notice was adequate as to this victim. Defense counsel stated at the second trial that the defense received the written statements of all the victims on March 31, 2010. (R. 641, C. 49-56.) Further, Pettibone had sufficient time to present the trial court with a pretrial motion in limine on April 27, 2010, for a pretrial hearing and for trial that occurred on May 3, 2010. Pettibone has not shown that he suffered any prejudice or experienced any difficulty in responding to the evidence the State presented in the victims’ written statements, which he received over a month before trial began. Therefore, the defense received adequate notice of the additional acts of abuse that were admitted as Rule 404(b), Ala. R. Evid., evidence.
B. Admissibility
Ordinarily, evidence of collateral bad acts would not be admissible. The general rule is that evidence of collateral bad acts or crimes is inadmissible to prove that the defendant acted in conformity with that bad character on the occasion for which he was being tried. Rule 404(b), Ala. R. Evid. The rule further provides that character evidence “may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” Rule 404(b), Ala. R. Evid. “Motive is defined as ‘an inducement, or that which leads or tempts the mind to do or commit the crime charged.’” Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988)(internal citations omitted).
“Evidence tending to establish motive is always admissible. Perkins v. State, 808 So.2d 1041, 1084 (Ala.Crim.App. 1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).”
Irvin v. State, 940 So.2d 331, 350 (Ala. Crim.App.2005).
“ ‘In determining whether evidence concerning a collateral act of sexual abuse is admissible to prove motive, we must consider the following factors: “ ‘(1) the offense(s) charged; (2) the circumstances surrounding the offense(s) charged and the collateral of *110 fense(s); (3) the other collateral evidence offered at trial, and (4) the other purpose(s) for which it is offered.’ ” Campbell v. State, 718 So.2d 123, 130 (Ala.Cr.App.1997), quoting Bowden v. State, 538 So.2d 1226, 1237 (Ala.1988).’
“Estes v. State, 776 So.2d 206, 210-11 (Ala.Crim.App.1999).”
Garner v. State, 977 So.2d 533, 537 (Ala. Crim.App.2007).
“[I]t is well settled that a collateral act of sexual misconduct need not match precisely the charged offense in order for evidence of the collateral act to be admissible.” Proctor v. City of Prattville, 830 So.2d 38, 42 (Ala.Crim.App.2001), citing Smith v. State, 745 So.2d 284, 290 (Ala. Crim.App.1998), and Ex parte Register, 680 So.2d 225 (Ala.1994); J.D.S. v. State, 587 So.2d 1249 (Ala.Crim.App.1991). This Court has previously held that in some cases where a school employee is the sexual offender, evidence of collateral sexual acts with and/or sexual statements to one student are admissible to prove motive in cases of abuse against other students. See Campbell v. State, 718 So.2d 123 (Ala. Crim.App.1997), and Proctor, supra.
Pettibone was charged with three counts of second-degree sexual abuse, one count of attempted second-degree sexual abuse, and four counts of enticing a child. The circumstances surrounding the offenses charged and the collateral offenses as to two victims—K.B. and D.S.—are not only similar, they are nearly identical. Pettibone abused, solicited, and had improper relationships with four different girls at the same middle school where he was a teacher. All four girls were white and were either in the seventh or eighth grade at the time the abuse occurred. Both D.S. and K.B. were scorekeepers for the athletic department. Pettibone began a friendship with each girl and communicated with all four girls using text messages, telephone calls, and/or notes he gave them at school. Further, Pettibone told several of the victims that he loved them using the numbers “1-2-3” in text messages. Pettibone would lure the girls to empty rooms in the school—either his classroom or athletic offices—where he would kiss them on the mouth or on the cheek, as in B.B.’s case. Specifically, D.S. testified that in addition to Pettibone touching her buttocks, he also pressed her hand to his penis. K.B. testified that in addition to touching her breasts and buttocks, Pettibone also pressed his penis to her buttocks. This evidence was admissible to show Pettibone’s motive for sexually abusing young girls.
Finally, because evidence of motive is always admissible, the State was not required to establish a proper foundation for the evidence. See Bowden, supra, and Perkins, supra. Therefore, we cannot say that the trial court abused its discretion in admitting the evidence.
IV.
Pettibone argues that the trial court erred in admitting into evidence his cell-phone records and the records associated with the victims’ or their parents’ cell phones. Specifically, Pettibone argues that the State failed to lay a proper predicate or to properly authenticate the records. According to Pettibone, the phone records are hearsay and do not fall within the business-records exception of Rule 803(6), Ala. R. Evid. Pettibone’s principal argument appears to be that. Lindsey Stewart, an employee of AT & T, who supplied phone service to Pettibone and three of the victims and their families, was not qualified as a records custodian and as a result could not properly authenticate the phone records that were admitted as evidence at trial.
*111 Stewart was a customer-service manager for AT & T, and she testified to the following. Stewart testified that her duties at AT & T include taking phone calls from customers who have billing questions and handling customers’ technical difficulties with their telephones. Stewart testified that she works in an AT & T office in Oceans Springs, Mississippi, and that part of her duties includes testifying at trials. Stewart affirmed that she was testifying as a records custodian for the purposes of this trial. Stewart testified that she is the custodian of records for At & T for the southeastern division of AT & T’s compliance center.
Pettibone objected to the admission of the following State’s Exhibits at the time that they were offered into evidence: 16, 17A, 17B, 17C, 17D, 18, 20, 21, 22A, 22B, and 22C, and 28. State’s Exhibit 28 contained, among other things, call records AT & T compiled for this trial in a compact disc (“CD”) format. The record reflects that the State printed out telephone records from that CD. Pettibone also moved to exclude the records from evidence. (R. 320.) The CD was marked with a file code of “527455” and was created on January 9, 2009. State’s Exhibit 17A was marked with a file code of “527455,” same as Exhibit 28. However, Stewart did not prepare the information contained on the CD and did not review the information on the CD before trial.
The trial court conducted a hearing outside of the presence of the jury at which the following transpired:
“THE COURT: Here’s my problem, [prosecutor], you’ve got a witness — no offense to what I’m about to say but you’ve got a witness that is testifying as custodian of records that she has said until she got on the stand she’s never looked at before.
“So, one, she’s never cross-referenced it to what AT & T has, she hasn’t cross-referenced to what the CD that she requested that they send in has or compared it to the written documents. So I’m not real sure why she’s here which is probably a question she’s asking as well.
“MR. SIMPSON: Your Honor, we called AT & T. We subpoenaed the records from AT & T. It is their standard practice to send — rather than send somebody from — at their home base, they have a regional service center. That’s where she is. That’s what she does. And they send somebody with the regional service center with the records. That’s what she talks about. That’s her job—
“THE COURT: .... I don’t care how big AT & T is. There are certain requirements under the Rules of Evidence that must be met and you can’t do it different just because the company is so big they don’t want to send somebody up here to testify to it....
“I mean, there are — from what I see that you’re trying to introduce, I think there are numerous ways to do it but putting somebody on the stand that doesn’t know anything about the records or identified the CD or cross-referenced it to the paper is not one of the ways to do it.
“MR. SIMPSON: Firsthand knowledge is not required of your authenticating witnesses, and if Your Honor will, under Gamble’s Rules of Evidence—
“THE COURT: For a custodian of records.
“MR. SIMPSON: For a custodian of records.
[[Image here]]
“THE WITNESS: .... AT & T asked me to be the custodian of records today to verify that these records are *112 true AT & T documents, that they are billed from AT & T. I have not looked through these records line-for-line.
[[Image here]]
“THE WITNESS: .... those are our documents and those are our CD’s, the way we compile records.
[[Image here]]
“THE WITNESS: I haven’t looked at the information on the CD—
“THE COURT: You’ve looked at the cover of the CD?
“THE WITNESS: Yes. That is an AT&T—
“MR. SIMPSON: She sees the infoi’-mation on the documents themselves are AT & T documents. They have AT & T on the top here. She’s able to talk about that’s the record on the CD. That’s that record number. She’s able to identify these are AT & T records ....
[[Image here]]
“THE COURT: And you are confident that those records or are you not confident that those records that you just looked at apply to those phone numbers and the dates that are listed on that document.
“THE WITNESS: Yes. I’m confident those are AT & T records for the dates that they state.”
(R. 327-82.)
The determination of the admissibility of evidence rests within the trial court’s discretion, and that discretion will not be disturbed except upon a clear showing of an abuse of discretion. See, e.g., Woods v. State, 13 So.3d 1 (Ala.Crim.App.2007). Furthermore, as the prosecution alluded to in the trial court, Professor Gamble says:
“Like any other document, a business record must be authenticated. This means that a foundation must be established, as a condition precedent to admissibility, with sufficient evidence to support a finding that the matter in question is what its proponent claims. If the document is claimed to be a record of the First National Bank then a foundation must be established to show that it is such. The party offering the business record should be alert to the fact that available methods of authentication may lie under the Alabama Rules of Evidence, statute, or other rule of court. Unless one of these sources grants self-authentication for certified copies, the proper method for authenticating a business record is via the testimony of an in-court witness. Consistent with this general authority, if one offers a document under Rule 803(6) then the proper method of authentication, as well as satisfying the elements of showing it to be a business record, is through the testimony of a shepherding witness. There is not a requirement that such a shepherding witness have firsthand knowledge of the matters recorded. Indeed, the witness may not have even been associated with the business at the time that the record was made. However, the witness must be either the custodian or one who knows whether it was the regular practice of the business to make such a record and whether the record was kept in the course of regularly conducted business.”
Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 254.01(3) at 1540 (6th ed.2009).
As for Pettibone’s challenge to Stewart’s qualifications, “[tjhere is no requirement that the authenticating witness be the custodian, entrant, or maker of the record.” Committee Comments to Rule 803(6), Ala. R. Evid. Stewart’s testimony that she is a customer-service manager at AT & T with access to the records and that she was able to verify that the records belong to AT & *113 T was sufficient to establish that Stewart was a “qualified witness” under Rule 803(6), Ala. R. Evid. (identifying as an exception to the hearsay rule “[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness ” (emphasis added)).
First, based on her experience working at AT & T, Stewart positively identified that the telephone records in State’s 17A, (State’s Exhibits 17B, 17C, and 17D were portions of those records) the telephone records for B.B.’s cell phone, which was purchased by her parents A.B. and D.B., were from AT & T and were AT & T records. (R. 299.) In addition, Stewart identified State’s Exhibits 16,18, and 20 as Pettibone’s AT & T records. (R. 307, 308, 313.) Stewart identified State’s Exhibit 21 as an AT & T billing statement for S.B., K.B.’s mother. (R. 309.) In State’s Exhibit 22A, 22B, and 22C, the State presented cell phone records for M.W., M.D.’s mother, and Stewart identified these records as AT & T records. (R. 311.) This testimony was sufficient to authenticate the records, i.e., “to support a finding that the matter in question is what its proponent claims.” Rule 901(a), Ala. R. Evid.
Second, Stewart testified that the records in State’s 17A were made in the regular course of AT & T’s business and that it was AT & T’s regular practice to make such records. (R. 299.) We conclude that Stewart’s testimony was sufficient to establish the proper predicate for admission of the AT & T records under the business-records exception to the hearsay rule. See Rule 803(6), Ala. R. Evid. Finally, although the records listed above may have been produced by AT & T specifically for trial or by the victims or the victims’ parents through their AT & T cellphone accounts, § 12-21-43, Ala.Code 1975, does not require that the maker of the records have personal knowledge of the records. Rather, a lack of personal knowledge goes to the weight of the records as evidence. See also Calcano v. Calcano, 257 Conn. 230, 241-42, 777 A.2d 633, 641 (2001) (“To require the defendant to produce a witness that could testify from personal knowledge as to the specific time that a particular document was made would unduly constrain the use of the business records exception.”), and People v. Abelson, 104 Cal.App.3d Supp. 16, 164 Cal. Rptr. 369 (1980) (relying on the dates contained in documents themselves to show that the documents were made contemporaneously with the event recorded). See Dowdell v. State, 790 So.2d 359, 361 (Ala. Crim.App.2000) (“The underlying rationale behind this [Rule 803(6) ] exception is that business records have the earmark of reliability or probability of trustworthiness, because they reflect the day-to-day operations of the enterprise and are relied upon in the conduct of business.”).
Finally, all the victims testified that Pet-tibone contacted them using their cell phones; hence, admission of this evidence was cumulative. Therefore, we cannot say that the trial court abused its discretion in admitting into evidence the telephone records for three victims, their parents, and for Pettibone because they were properly authenticated, and the State laid an appropriate predicate for the records.
V.
Pettibone argues that the State erroneously elicited testimony from Rex Bishop, *114 an investigator with the Robertsdale Police Department, regarding Pettibone’s post-Miranda[6] silence and that the testimony created ineradicable error.
At trial, the following occurred:
“Q. [Prosecutor:] When you arrested Mr. Pettibone, did you attempt to interview him?
“A. [Bishop:] I was told he did not want to be interviewed.”
(R. 527.)
Defense counsel objected and requested an immediate instruction to the jury on Pettibone’s constitutional right not to testify. The trial court gave the following instruction:
“THE COURT: Ladies and gentlemen, you are not to draw any inference whatsoever — well, let me back up. Anytime someone may be accused of a crime, they have the right under the Fifth Amendment to the Constitution not to discuss it, especially with someone that is — that is investigating it or you [perceive] to be on the other side.
“The fact that Mr. Pettibone advised either directly or indirectly the officer that he did not wish to talk to him is simply invoking his constitutional right not to do that at that time and you are not to draw any inference whatsoever— certainly you are not to draw any type of negative inference from that because that is an absolute constitutional right that he has.”
(R. 530.) Pettibone did not object after the trial court instructed the jury.
Initially, we note that Pettibone did not receive an adverse ruling as to any issue regarding Investigator Bishop’s testimony because in response to defense counsel’s objection, the trial court gave defense counsel its requested limiting instruction. It is incumbent upon counsel to obtain an adverse ruling to preserve an issue for appellate review. See Jones v. State, 895 So.2d 376 (Ala.Crim.App.2004); and Ragsdale v. State, 448 So.2d 442 (Ala.Crim.App. 1984). Because Pettibone received the only relief he requested — an instruction on the right not to testify — there is no adverse ruling, and nothing for this Court to review.
Moreover, in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that an accused’s post-arrest, post-Miranda silence may not be used against the accused at trial. See Ex parte Harris, 387 So.2d 868, 871 (Ala.1980) (recognizing that it is “fundamentally unfair and in violation of due process of law to inform a person under arrest that he has a right to remain silent and then permit an inference of guilt from that silence”).
“In Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), the United States Supreme Court ‘clarified that “the holding of [Doyle v. Ohio, 426 U.S. 610 (1976),] is that the Due Process Clause bars ‘the use for impeachment purposes’ of a defendant’s post-arrest silence.” ’ United States v. Stubbs, 944 F.2d 828, 834 (11th Cir.1991), quoting Greer, 483 U.S. at 763, 107 S.Ct. at 3108, in turn quoting Doyle, 426 U.S. at 619, 96 S.Ct. at 2245. Furthermore, ‘[w]hile a single comment alone may sometimes constitute a Doyle violation, the Supreme Court’s opinion in Greer makes clear that a single mention does not automatically suffice to violate defendant’s rights when the government does not specifically and expressly attempt to use — as was attempted in Doyle and Greer — the improper comment to impeach the defendant. See Lindgren v. Lane, 925 F.2d 198, 201 (7th Cir.1991).’ *115 Stubbs, 944 F.2d at 835. (Emphasis in original.)”
Wilkerson v. State, 686 So.2d 1266, 1272 (Ala.Crim.App.1996).
The record on appeal indicates that the prosecutor made no further mention of Pettibone’s post-Miranda silence at trial. Additionally, the record does not contain any indication that the prosecution “specifically and expressly attempted] to use — as was attempted in Doyle and Greer [v. Miller, 483 U.S. 756 (1987) ] — the improper comment to impeach the defendant.” Wilkerson, 686 So.2d at 1272. For these reasons, Investigator Bishop’s testimony did not constitute an improper comment on Pettibone’s post-arrest silence for purposes of Doyle.
Furthermore, the trial court provided an immediate curative instruction, and jurors are presumed to follow the trial court’s instructions. “There is a pri-ma facie presumption against error when the trial court immediately charges the jury to disregard the improper remarks. The trial court is in the best position to determine whether improper remarks are so prejudicial as to be ineradicable.” Morton v. State, 581 So.2d 562, 565 (Ala.Crim. App.1991) (citations omitted). See also Brown v. State, 516 So.2d 882, 886 (Ala. Crim.App.1987). “A proper limiting instruction is deemed to cure the effects of prejudicial remarks made before a jury.” Wells v. State, 619 So.2d 228, 230 (Ala. Crim.App.1993). Further, “[w]here ... the ‘trial court acts promptly to impress upon the jury that improper [questions] are to be disregarded by them in their deliberations, the prejudicial effects of such remarks are removed.’ ” Reed v. State, 717 So.2d 862, 867 (Ala.Crim.App. 1997).
To the extent that Pettibone challenges the instruction the trial court gave to the jury, we note that Pettibone did not object to the curative instruction given by the trial court immediately after the trial court gave the instruction nor did he move for a mistrial. Therefore, this court is precluded from reviewing the adequacy of the curative instruction given by the trial court. See Lauderdale v. State, 555 So.2d 799 (Ala.Crim.App.1989) (holding that, where the trial court gives a curative instruction and no further objection is made by the appellant, there is no error for this court to review).
VI.
Next, Pettibone challenges the sufficiency of the evidence. Pettibone presented his arguments in a motion for a judgment of acquittal made at the close the State’s evidence, at the close of all of the evidence, and after sentencing. (R. 636-644, 691-695, Sentencing R. 4-12.) Initially, we note that Pettibone does not challenge all the convictions as to each victim. However, each argument for the particular conviction he does challenge will be set forth below for each victim.
“With respect to the sufficiency-of-the-evidence claim, it is well settled that ‘ “[i]n determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’ Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim. App.1984), aff'd, 471 So.2d 493 (Ala. 1985). ‘ “The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. *116 State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘“When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” ’ Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Bankston v. State, 358 So.2d 1040, 1042 (Ala.1978).”
Williams v. State, 10 So.3d 1083, 1086 (Ala.Crim.App.2008).
“ ‘Circumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala.Crim.App. 1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala.Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).’ ”
Lockhart v. State, 715 So.2d 895, 899 (Ala. Crim.App.1997) (quoting Ward v. State, 610 So.2d 1190, 1191-92 (Ala.Crim.App. 1992)).
“ ‘ “Intent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.” ’ Seaton v. State, 645 So.2d 341, 343 (Ala. Crim.App.1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim. App.1986)). Intent ‘ “ ‘may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.”” Farrior v. State, 728 So.2d 691, 695 (Ala.Crim.App. 1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980)). ‘“The intent of a defendant at the time of the offense is a jury question.”’ C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App. 2001) (quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993)).”
Dickey v. State, 901 So.2d 750, 754 (Ala. Crim.App.2004).
In this case, Pettibone was convicted of violating the following statutes:
Section 13A-6-67, Ala.Code 1975, which provides, in pertinent part:
“(a) A person commits the crime of sexual abuse in the second degree if:
[[Image here]]
“(2) He, being 19 years old or older, subjects another person to sexual contact who is less than 16 years old, but more than 12 years old.”
Section 13A-4-2, Ala.Code 1975, provides in pertinent part:
“(a) A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense.”
Section 13A-6-69, Ala.Code 1975, which provides, in pertinent part:
“(a) It shall be unlawful for any person with lascivious intent to entice, allure, persuade or invite, or attempt to *117 entice, allure, persuade or invite, any child under 16 years of age to enter any vehicle, room, house, office or other place for the purpose of proposing to such child the performance of an act of sexual intercourse or an act which constitutes the offense of sodomy or for the purpose of proposing the fondling or feeling of the sexual or genital parts of such child or the breast of such child, or for the purpose of committing an aggravated assault on such child, or for the purpose of proposing that such child fondle or feel the sexual or genital parts of such person.”
In addition, § 13A-6-60, Ala.Code 1975, defines sexual contact as:
“(3) Sexual Contact. Any touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party.”
A. Evidence Presented as to B.B.
Pettibone argues that the State presented insufficient evidence to convict him of enticement and attempted second-degree sexual abuse of B.B. as charged in counts one and two of the indictment. Specifically, Pettibone argues that he did not entice B.B. to a specific place with lascivious intent and that the only testimony of contact or attempted contact between him and B.B. referred to hugging and a quick kiss on the cheek.
However, B.B. testified that she and Pettibone exchanged text messages and talked on the phone often and sometimes late at night. When B.B.’s mother became suspicious of what B.B. was doing on the phone so late, Pettibone purchased a phone for B.B. so they could continue to communicate without arousing further suspicion on the part of B.B.’s mother. Petti-bone began telling B.B., “1-2-3,” meaning that he loved B.B.
B.B. testified:
“We were on the way to a basketball game one day and we were texting and he told me to look at him and lick my lips sexy-like and look at his arms, how big they were and stuff like that. And then one time, on the way, he told me that he was horny and to come fix it.”
(R. 282.)
B.B. testified that Pettibone licked his lips at her while she was sitting on the seat of the bus and that Pettibone stood in the aisle flexing his muscles at her. B.B. stated that Pettibone told her on the phone that he had heard that B.B. had been “fingered” by one of her previous boyfriends and asked if he could do the same. (R. 283.) B.B. told Pettibone that he could not. B.B. testified that she and Pettibone also began hugging side-to-side but testified that one day Pettibone sent her a text message and stated that “he didn’t want no more of that side crap, he wanted a real hug, like face-to-face.” (R. 284.) B.B. further testified,
“He asked me if he could kiss me and I was, like, I don’t know. He asked me, like of a certain number from, like, one to ten. I give him a number. I can’t remember what it was. He asked if there was any chance of a tongue kissing and I responded I don’t know still.”
(R. 285.)
B.B. also stated that, in one instance, she was alone with Pettibone in his classroom, and Pettibone locked the door to the room, began telling her how much he cared for her, and kissed her on the cheek. Peggy Johnson corroborated that she saw Pettibone and B.B. alone in a classroom together. Pettibone also sent B.B. a text message and asked her to meet him somewhere during a basketball game, but B.B. *118 did not meet with him. Finally, because the testimony of all the victims was admitted in the same trial, Pettibone’s behavior as to M.D., K.B., and D.S. was indicative of his behavior as to B.B. as going to motive. From that evidence, the jury could reasonably have concluded that Pettibone committed an overt act toward subjecting B.B. to sexual contact. Further, from that evidence, the jury could conclude that Petti-bone enticed or lured B.B. to his classroom with the intent to propose sexual contact with her or to fondle or feel B.B.’s sexual parts or to propose that she fondle his genitals. Based upon the record before us, we hold that there was sufficient legal evidence from which the jury could reasonably have found Pettibone guilty of enticement and attempted second-degree sexual abuse as to B.B.
B. Evidence presented as to D.S.
Initially, we question whether this argument is preserved. Defense counsel stated during his motion for a judgment of acquittal at the close of the State’s case: “I would admit as to Count VIII and Count IX, there is some testimony, if the witness’s testimony is to be believed, that it could be an either/or in Count VIII or Count IX and would be an either or in Count V or Count VI.” (R. 640.) However, at the close of all the evidence, the defense asked the trial court to dismiss Count VIII, though no grounds were stated. (R. 695.) Out of an abundance of caution, we will address Pettibone’s argument as to Count VIII.
Pettibone argues that the State did not present sufficient evidence that he sexually abused D.S. because the initial charges under which the State proceeded alleged no sexual contact. It appears that Petti-bone argues that if he did, in fact, touch D.S.’s buttocks, the touching of the buttocks is not sexual contact. In addition, Pettibone argues that the State presented insufficient evidence that he enticed D.S. to a specific place for sexual intercourse or for sexual contact.
However, D.S. testified that she and Pettibone would meet either before and after basketball games either in Petti-bone’s classroom, in a closet in his classroom, or in the locker room. D.S. also testified that she and Pettibone would meet in the coach’s office during basketball games. D.S. testified that she and Petti-bone kissed one another on multiple occasions and that Pettibone touched her back, buttocks, and stomach over her clothes. Pettibone and D.S. would talk on the phone, text one another, and Pettibone told D.S. that he loved her, using the code “1-2-3.” (R. 565.) From that evidence, the jury could have concluded that Petti-bone enticed or lured D.S. to his classroom, to the coach’s office, or to the locker room to propose sexual contact with her or to fondle or feel D.S.’s sexual parts, or to propose that D.S. feel his sexual parts.
As to Pettibone’s contention that touching D.S.’s buttocks is insufficient evidence of sexual contact within the meaning of § 13A-6-60(3), Ala.Code 1975, this Court held in Roughton v. State, 644 So.2d 1339 (Ala.Crim.App.1994), that evidence that Roughton touched the victim’s buttocks and rubbed the inside of the victim’s thighs was sufficient evidence of “sexual contact.” Further, this Court held in Parker v. State, 406 So.2d 1036, 1039 (Ala. Crim.App.1981), that the thigh and stomach are intimate parts within the meaning of sexual contact. Therefore, based upon the record before us, we hold that there was sufficient legal evidence from which the jury could reasonably have found Pet-tibone guilty of enticement and of second-degree sexual abuse as to D.S.
C. Evidence presented as to KB. and M.D.
Finally, Pettibone argues that the State presented insufficient evidence that *119 he enticed K.B. and M.D. to a specific place for sexual intercourse or sexual contact.
M.D. testified that she and Pettibone began text messaging one another and that they discussed kissing. M.D. stated that Pettibone would invite her to his classroom to grade papers for him. When M.D. entered the classroom, Pettibone pointed to a table in the corner and told M.D. to go sit at the table. The door to the classroom was locked, and Pettibone began kissing M.D. Pettibone kissed M.D. with an open mouth, put his hands under her shirt but on top of her bra, and put his hands between M.D.’s thighs. M.D. testified that Pettibone touched her private area on top of her clothes. M.D. testified that she could see that Pettibone had an erection. From that evidence, the jury could have found that Pettibone enticed or lured M.D. to his classroom to propose sexual contact with her or to fondle or feel M.D.’s sexual parts, or to propose that she or feel his sexual parts.
KB. testified that she kept score at basketball games for Schreck and Petti-bone and that she was also in Pettibone’s science class. K.B. and Pettibone began text messaging each other and discussed kissing, hugging, and possibly going further physically. K.B. testified that she and Pettibone began meeting in the coach’s office and began hugging and kissing. Pettibone touched KB.’s breasts over her clothes. Pettibone turned KB. around and pressed his penis against KB.’s buttocks while Pettibone had an erection. From that evidence, the jury could have concluded that Pettibone enticed or lured KB. to the coach’s office to propose sexual contact with her or to fondle or feel KB.’s sexual parts, or to propose that she fondle or feel his sexual parts.
Based upon the record before us, we hold that there was sufficient legal evidence from which the jury could reasonably have found Pettibone guilty of enticement as to KB. and M.D.
D.
Therefore, for the reasons given above, the trial court did not err in denying Petti-bone’s motions for a judgment of acquittal on those charges.
VII.
Finally, Pettibone argues that the trial court’s jury instructions contained incorrect or misleading statements of law and that the trial court “mistakenly instructed the jury about material allegations.” (Pet-tibone’s brief, at 69.)
The State argues, and we agree, that Pettibone has failed to comply with the requirements of Rule 28(a)(10), Ala. R.App. P.
In Bryant v. State, [Ms. CR-08-0405, Feb. 4, 2011], — So.Bd - (Ala.Crim. App.2011), when reviewing an appellant’s cursory argument that contained no citations to the page numbers of the record supporting the claims raised and contained no legal argument supporting the general assertion that the trial court had erred, we discussed the cases holding that Rule 28(a)(10) is to be cautiously applied. We then held:
“Here, too, we find that Bryant’s cursory summary of the claims in his petition with no specific discussion of the facts or law in the form of an argument as to why he believes these claims were improperly summarily dismissed, with only citations to page or paragraph numbers, and with only a single citation to general legal authority is not sufficient to comply with Rule 28(a)(10).”
Bryant, — So.3d at-.
As in Bryant and in the cases on which it relied, we find that Pettibone’s *120 failure to present any facts indicating which jury instructions he claims were incorrect; his failure to provide any citations to the record indicating that he had requested certain instructions or had objected to any allegedly incorrect instructions; his failure to cite any specific legal authority in support of his argument; and his failure to present any argument supporting his assertion that certain jury instructions contained incorrect facts and law supports our determination that Pettibone failed to comply with Rule 28(a)(10) and that he has waived the argument for purposes of appellate review.
VIII.
Pettibone was sentenced as having committed a Class A misdemeanor for each of his three second-degree-sexual-abuse convictions. Thus, Pettibone received a term of one year in prison for each second-degree-sexual-abuse conviction. The State argues in its brief on appeal that we should remand this case for resentencing because Pettibone’s sentences for second-degree sexual abuse should be enhanced from misdemeanors to felonies pursuant to § 13A-6-67(b), Ala. Code 1975. Section 13A-6-67(b), Ala.Code 1975, states:
“Sexual abuse in the second degree is a Class A misdemeanor, except that if a person commits a second or subsequent offense of sexual abuse in the second degree within one year of another sexual offense, the offense is a Class C felony.”
Specifically, the State argues:
“In each sexual abuse case, Pettibone enticed his victim into a room at school where he then abused her. See (R. 557-59, 563-65, 596-99, 623-26). Enticing a child is a ‘criminal sex offense’ as that term is defined in the Code of Alabama. See Ala.Code 15-20-21(4)e. Thus, Petti-bone sexually abused each of his victims immediately after committing ‘another sexual offense,’ and each of those instances of sexual abuse constituted a Class C felony under § 13A-6-67(b). Thus, Pettibone’s three one-year sentences for these convictions are outside the range of punishment authorized by law. See Ala.Code § 13A-5-6(a)(3). Accordingly, this Court should remand this case to the trial court with instructions to resentence Pettibone for those class C felony offenses.”
(State’s brief, at pp. 98-99.)
Pettibone argues in his reply brief on appeal that the State’s request for resen-tencing was untimely because it is being made for the first time on appeal and that it invades the trial court’s discretion in sentencing.
If Pettibone was sentenced outside the mandate of the statute, his sentence is illegal. “ ‘[A]n allegedly illegal sentence may be challenged at any time, because if the sentence is illegal, the sentence exceeds the jurisdiction of the trial court and is void.’” Cruitt v. State, 893 So.2d 1236, 1238 (Ala.Crim.App.2003) (quoting Rogers v. State, 728 So.2d 690, 691 (Ala.Crim.App.1998)). “We are required to notice an illegal sentence and remand to the sentencing court for a proper sentence.” Glass v. State, 14 So.3d 188, 194 (Ala.Crim.App.2008), citing Kennedy v. State, 929 So.2d 515, 523 (Ala.Crim.App. 2005); and Mosley v. State, 986 So.2d 476 (Ala.Crim.App.2007).
We agree with the State’s construction of § 13A-6-67(b) for the reasons that follow.
“In any case involving statutory construction, our inquiry begins with the language of the statute, and if the meaning of the statutory language is plain, our analysis ends there.” Ex parte McCormick, 932 So.2d 124 (Ala.2005).
*121 ‘“Principles of statutory construction instruct this Court to interpret the plain language of a statute to mean exactly what it says and to engage in judicial construction only if the language in the statute is ambiguous.’ Ex parte Pratt, 815 So.2d 582, 535 (Ala.2001).
[[Image here]]
“ ‘ “Moreover, ‘one “is not to be subjected to a penalty unless the words of the statute plainly impose it,” Keppel v. Tiffin Savings Bank, 197 U.S. 356, 362, 25 S.Ct. 443, 49 L.Ed. 790 [(1905)]....
“ ‘ “Words used in the statute must be given their natural, plain, ordinary, and commonly understood meaning.” Alabama Farm Bureau Mut. Casualty Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala. 1984). The general rule of construction for the provisions of the Alabama Criminal Code is found in Ala.Code 1975, § 13A-1-6: “All provisions of this title shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law, including the purposes stated in section 13A-1-3....”’
“Carroll v. State, 599 So.2d 1253, 1264-65 (Ala.Crim.App.1992).”
Crawford v. State, [Ms. CR-09-1227, April 29, 2011] — So.3d -, - (Ala.Crim. App.2011).
“[W]hen a term is not defined in a statute, the commonly accepted definition of the term should be applied.” Bean Dredging, L.L.C. v. Alabama Dep’t of Revenue, 855 So.2d 513, 517 (Ala.2003), citing Republic Steel Corp. v. Horn, 268 Ala. 279, 281, 105 So.2d 446, 447 (1958). The words used in § 13A-6-67(b) are not defined by the legislature; however, the language of the statute is simple and unambiguous as shown as reflected in the Merriamr-Web-ster’s Collegiate Dictionary (11th ed.2003). The statute begins by stating the general rule: “Sexual abuse in the second degree is a Class A misdemeanor.” The general rule is followed by the exception to the rule, which begins with the word “except.” “Except” may be defined as “unless.” Merriamr-Webster’s Collegiate Dictionary 435 (11th ed.2003). So, § 13A-6-67(b) begins: “Sexual abuse in the second degree is a Class A misdemeanor, [unless] ... a person commits a second or subsequent offense of sexual abuse in the second degree .... ” “Commits” is defined as “perpetrate.” Merriam-Webster’s Collegiate Dictionary 250 (11th ed.2003).[7] In turn, “perpetrate” is defined as, “to bring about or carry out.” Merriamr-Webster’s Collegiate Dictionary 923 (11th ed.2003). “Or” is used “as a function word to indicate an alternative.” Merriamr-Webster’s Collegiate Dictionary 872 (11th ed.2003). The words “second” and “subsequent” modify “offense of sexual abuse.” “Second,” as an adjective, is defined as “next to the first in place or time.” Merriamr-Webster’s Collegiate Dictionary 1121 (11th ed.2003). “Subsequent,” as an adjective, is defined as “following in time, order, or place.” Merriamr-Webster’s Collegiate Dictionary 1245 (11th ed. 2003). The words “offense of sexual abuse” refer to the definition of sexual abuse provided in *122 § 13A-6-67, Ala.Code 1975.[8] Section 13A-6-67(b) concludes with “within one year of another sexual offense, the offense is a Class C felony.” “[Wjithin one year” clearly means within 12 months. “[AJnother sexual offense” clearly refers to any sexual offense defined as such in the statutes of Alabama. Therefore, giving ordinary meaning to these words, § 13A-6-67(b) reads:
“Sexual abuse in the second degree is a Class A misdemeanor, [unless] ... a person [carries out his or her next, or alternatively, any following] offense of sexual abuse in the second degree within [12 months] of [any other sexual offense], the offense is a Class C felony.”
Therefore, when giving plain meaning to the words of the statute, the enhancement does not apply to a defendant’s first offense of second-degree sexual abuse unless that first offense follows, within 12 months, the commission of any other sexual offense. The enhancement does apply where, as in Pettibone’s case, the second-degree sexual abuse does follow, within twelve months, any other sexual offense. If the legislature intended for a defendant’s first offense of second-degree sexual abuse, which does not follow within one year of another sexual offense, to be treated as a felony, the Legislature could have used in § 13A-6-67 the word “antecedent,” which, as an adjective, is defined as “prior.” Merriam-Webster’s Collegiate Dictionary 52 (11th ed.2003). Alternatively, other words besides “antecedent” could have been used to reflect this intent.
Moreover, even if the statute were to be considered ambiguous, the rule of lenity would prohibit an interpretation that would enhance an instance of second-degree sexual abuse that was not preceded by another sexual offense. The rule of lenity mandates that “ ‘ambiguous criminal statute[s] ... be construed in favor of the accused.’ ” State v. Adams, [Ms. CR-08-1728, November 5, 2010] — So.3d - (Ala.Crim.App.2010) (citations omitted). Further, it is well settled that criminal statutes are strictly construed against the State. Ex parte Hyde, 778 So.2d 237 (Ala. 2000). In addition,
“ ‘[w]e are deeply mindful of the principle that criminal statutes are to be strictly construed, but adherence to strict construction does not require an unreasonable interpretation, an interpretation that the legislature could not have intended.’ Horsley v. State, 374 So.2d 363, 372 (Ala.Cr.App.1978), affirmed, 374 So.2d 375 (Ala.1979), vacated on other grounds, Horsley v. Alabama, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980). See Ala.Code 1975, § 13A-1-6 (criminal statutes ‘shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law....’).”
Hunt v. State, 642 So.2d 999, 1028 (Ala. Crim.App.1993).
Here, the State presented evidence that during the 2008-2009 school year at Central Baldwin Middle School, Pettibone, who was a teacher and basketball coach, enticed B.B.,[9] D.S., M.D., and K.B., to an empty schoolroom in order to have inap *123 propriate physical contact with each young girl — i.e., to fondle or feel the girl’s sexual parts or breast, a violation of § 13A-6-69(a), Ala.Code 1975. Thus, in this case, each instance of second-degree sexual abuse followed the sexual offense of enticing a child for immoral purposes. See § 13A-6-69(a), Ala.Code 1975. Section 15 — 20—21(4)(e), Ala.Code 1975, specifically designates and defines enticement for immoral purposes as a “Criminal Sex Offense.” Moreover, although the record does not reflect the precise dates the enticement for immoral purposes and the sexual abuse occurred, the record is clear that all of these sexual offenses occurred within the 2008-2009 school year, i.e., within a period of 12 months.
Here, because each offense of second-degree sexual abuse followed a prior sexual offense and all the offenses were committed within a period of 12 months, Petti-bone’s sentences to one year in prison for second-degree sexual abuse[10] do not fall within the statutory range of punishment. Each sentence for the second-degree sexual abuse committed against D.S., M.D., and KB. should be enhanced under § 13A-6-67(b), Ala.Code 1975, to Class C felonies.[11] Therefore, this case must be remanded for sentencing pursuant to § 13A-5-6(a)(3), Ala.Code 1975. Further, the trial court ordered Pettibone to pay three assessments of $25 to the Crime Victims Compensation Fund for each of his three second-degree-sexual abuse convictions. However, § 15 — 23—17(b), Ala.Code 1975, states that offenders who are convicted of a felony shall pay an assessment of not less than $50. Therefore, Pettibone’s assessments are not within the statutory range.
Accordingly, this case is remanded to the trial court with instructions that the trial court: (1) hold a new sentencing hearing and sentence Pettibone in compliance with § 13A-6-67(b) for the second-degree-sexual-abuse convictions committed against D.S., M.D., and K.B.; (2) indicate whether those sentences are to run concurrently or consecutively with each other or his other convictions; and (3) impose three assessments for the Crime Victims Compensation Fund within the statutory range for Pettibone’s three second-degree-sexual-abuse convictions.
The record should be certified and transmitted to this Court at the earliest possible date and by no later than 28 days from the date of this opinion.
AFFIRMED AS TO CONVICTIONS AND REMANDED WITH INSTRUCTIONS AS TO SENTENCING.*
*124 KELLUM, BURKE, and JOINER, JJ., concur. WINDOM, J., concurs in the result.

. It is not clear from Pettibone's brief which allegations from the other victims — K.B., B.B., and M.D. — -were new allegations that were not presented in the first trial.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Pettibone argues that the trial court's instructions as to the elements of the offenses with which Pettibone was charged were confusing because, he says, the instructions muddied the charged offenses with the collateral allegations. We will address this argument at length later in this opinion.

. The trial court errantly refers to the enticement charges as solicitation charges.

. Pettibone renewed his objections as to K.B. and D.S.'s additional testimony at the time each girl presented her testimony. (R. 574, 625.)

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. We leave for another day to consider the implications of the legislature’s choice of the word "commits” as opposed to the phrase "is convicted of.” Moreover, the possible implication of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that any fact which increases a punishment above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt), is not before the Court in the instant case.

. “(a) A person commits the crime of sexual abuse in the second degree if:
"(1) He subjects another person to sexual contact who is incapable of consent by reason of some factor other than being less than 16 years old; or
"(2) He, being 19 year old or older, subjects another person to sexual contact who is less than 16 years old, but more than 12 years old.”
§ 13A-6-67, Ala.Code 1975.

. As to B.B., Pettibone was convicted of attempted second-degree sexual abuse.

. We note for the sake of clarity that attempted second-degree sexual abuse is a distinct offense from second-degree sexual abuse, and, thus, Pettibone's sentence for this offense should not be enhanced pursuant to § 13A-6-67(b).

. In Taylor v. State, 23 So.3d 692 (Ala.Crim. App.2008), Taylor was convicted of second-degree rape and second-degree sexual abuse and was sentenced to 20 years’ imprisonment for the second-degree-rape conviction and to 10 years’ imprisonment for the second-degree-sexual-abuse conviction. This Court remanded the case for sentencing as to Taylor’s second-degree-sexual abuse conviction pursuant to § 13A-5-7(a)(l), Ala.Code 1975, as a Class A misdemeanor, because the record did not "indicate that the offense in this case was a second or subsequent offense of second-degree sexual abuse that was committed within one year of another sexual offense.” 23 So.3d at 693.

 Note from the reporter of decisions: On December 9, 2011, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On January 13, 2012, that court denied rehearing, without opinion. On March 9, 2012, the Supreme Court denied certiorari review, without opinion (1110493).